DRIVERS, CHAUFFEURS, WARE-HOUSEMEN AND HELPERS TEAM-STERS LOCAL UNION NO. 71, a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Appellee,

v.

AKERS MOTOR LINES, INC. and Akers-Central Motor Lines, Inc., Appellants.

DRIVERS, CHAUFFEURS, WARE-HOUSEMEN AND HELPERS TEAM-STERS LOCAL UNION 71, a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Appellants,

v.

AKERS MOTOR LINES, INC. and Akers-Central Motor Lines, Inc., Appellees.

Nos. 78–1254, 78–1286.

United States Court of Appeals, Fourth Circuit.

Argued July 20, 1978.

Decided Sept. 19, 1978.

Hugh J. Beins, Washington, D. C. (Jonathan G. Axelrod, Bethesda, Md., Francis M. Fletcher, Jr., Charlotte, N. C., on brief), for appellant.

J. W. Alexander, Jr., Charlotte, N. C. (Blakeney, Alexander & Machen, Kennedy, Covington, Lobdell & Hickman, Charlotte, N. C., on brief), for appellees.

Before WINTER and HALL, Circuit Judges, and FIELD, Senior Circuit Judge.

K. K. HALL, Circuit Judge:

■ The issue presented in this appeal is whether a federal court may enjoin an employer, who is in the process of partially liquidating his business, from further encumbering capital assets pending resolution of ongoing arbitration of grievances filed by the union. The district court held that, on the facts of this case, injunctive relief was proper to maintain the *status quo*. We affirm.

Akers Motor Lines, Inc. and Akers-Central Motor Lines, Inc. [hereinafter "Akers-Central"] are a joint employer signatory to some six labor contracts[1] with Drivers, Chauffeurs, Warehousemen and Helpers Teamsters Local Union No. 71 [hereinafter "Local 71"]. The collective bargaining agreements contain no-strike and no-lockout provisions, and call for mandatory grievance and arbitration procedures.[2]

Akers-Central is engaged in the business of interstate haulage of various commodities. Before 1975, most of these commodities [hereinafter "general commodities"] were hauled by Local 71 employees in tractors and trailers owned by Akers-Central, and handled by Local 71 employees in terminals owned by Akers-Central. The employer, however, could not profitably haul "special commodities," notably steel, using union employees, so a "Steel Rider" to the Over-The-Road Supplemental Agreement specifically exempted these items from the collective bargaining agreement negotiated by the union. In 1975 Akers-Central began an expanded special commodities operation, and Local 71 negotiated a "Special Commodity Rider" which limited the definition of special commodities to include only steel and refrigerated commodities which could be hauled on flatbed trailers or refrigeration vans.

Subsequently, Akers-Central's chief negotiator was fired and Victor DeMaras, president of the company, repudiated the Special Commodity Rider; no supplanting agreement has ever been negotiated, but DeMaras did give Local 71 his commitment that no van-type trailers would be used in the special commodities operation.

From 1975 to 1977 Akers-Central continued to expand the special commodities operation while simultaneously cutting back on the general commodities operation. In October, 1977, Akers-Central began to liquidate the general commodities division. It sold most of its tractors and trailers, then leased them for use in the special commodities operation, sold or leased most of its terminals, and sold (subject only to final approval from the Interstate Commerce

---

1. Akers-Central and Local 71 are signatories to the National Master Freight Agreement, effective from April 1, 1976 to March 31, 1979. This Master Agreement contains three supplements: the Carolina Freight Council Over-The-Road Supplemental Agreement, covering road drivers; the Carolina Freight Council City Cartage Supplemental Agreement, covering city employees; and the Carolina Freight Council Automotive Maintenance Supplemental Agreement, covering maintenance employees. It also contains the Eastern Conference Area Iron & Steel Rider, exempting steel and "special commodity" items, see p. 1338, *infra*, from the purview of the Master Agreement. Akers-Central and Local 71 are also signatories to the Carolina Area Office Clerical Agreement, effective from May 1, 1977 to April 30, 1980, covering clerical employees, and the Building Maintenance Agreement, effective from March 1, 1976 to February 28, 1979, covering janitors.

2. The grievance procedure detailed in the National Master Freight Agreement provides for a three-tier system composed of the Carolina Bi-State Committee, the Eastern Conference Joint Area Committee, and the National Grievance Committee. At each step in the grievance procedure either party is permitted one delay. A deadlock on an issue at any level requires a hearing at the next level, then remand for hearings on any unresolved issues remaining.

Commission) some of its interstate operating rights. By February, 1978, it had laid off all but two of its approximately twelve hundred Local 71 employees, while hiring one hundred sixty-six non-union road drivers.[3] In the spring of 1978, the special commodities operation had grossed $1,000,-000 in one four-week period. Local 71 alleges that this is a calculated scheme on Akers-Central's part to freeze out the union; it alleges that the special commodities operation is simply the general commodities operation in disguise. Akers-Central counters by terming its layoff of all but two Local 71 employees "tragic," but says that liquidation of the general commodities division was a legitimate response to adverse business conditions.

Local 71 had already initiated its first grievance on September 29, 1977, requesting that Akers-Central be ordered to cease and desist the special commodities operation and to compensate all Local 71 employees already laid off for lost earnings. This grievance was prompted by the discovery that a special commodities trailer was hauling general commodities, namely rugs. On February 20, 1978, the union filed another grievance requesting the same relief, when another special commodities tractor was found to contain general commodities. Finally, on March 1, 1978, Local 71 filed five additional grievances, alleging that Akers-Central had violated the Master Agreement by failing to pay earned vacation monies to road drivers, city employees, maintenance employees, office employees, and janitorial employees.

On March 10, 1978, Local 71 filed a Complaint and Motion for Preliminary Injunction against Akers-Central. A three-day trial was held, with Local 71 presenting nine witnesses and some seventy exhibits, and Akers-Central presenting two witnesses and ten exhibits. The district court issued a preliminary injunction and, after a subsequent hearing, finalized the injunction. The district court found, *inter alia*, that the

grievances were arbitrable, that Local 71 and the employees it represented would suffer more from denial of injunctive relief than Akers-Central would from its grant, and that preservation of the *status quo* was necessary to prevent irreparable harm to Local 71. *See Lever Brothers Co. v. International Chemical Workers Union, Local 217*, 554 F.2d 115, 119 and n.6 (4th Cir. 1976). The court also found substantial likelihood of recovery by Local 71 on the grievances. The court, however, refused to issue an order for expedited arbitration, finding that the grievances were already before the arbitrator and any delays were inherent in the system which the parties had negotiated for and agreed upon. Finally, included in the district court's order was a provision which allowed the evidence developed through discovery at the court hearing to be used by the arbitrator. Akers-Central's request for a modification of this portion of the order was denied.

Local 71 filed an appeal, challenging the district court's refusal to order expedited arbitration, and its maintenance of the *status quo* at the time the injunction issued, rather than restoration of the *status quo ante* at the time the first grievance was filed. Akers-Central cross-appealed, contending that the injunction was improper because it violated the rule of *Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), and because it encroached upon the exclusive statutory jurisdiction of the Interstate Commerce Commission.

## I.

### THE INJUNCTION

Three cases cast a long shadow over our consideration of whether injunctive relief was appropriate to "freeze" further encumbrance of an employer's capital assets pending resolution of grievance arbitration: *Boys Markets, Inc. v. Retail Clerk's Union,*

3. There is evidence that approximately four to six of these drivers are covered by a labor contract with a local union in New York City.

*Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO, supra* ; and *Lever Brothers Co. v. International Chemical Workers Union, Local 217, supra.* An analysis of these decisions— their holdings, their rationales, and their interrelationship—is necessary to our determination that this injunction is not violative of the Norris-LaGuardia Act, § 4, 29 U.S. C.A. § 104.

In *Boys Markets,* the Supreme Court analyzed the history of federal labor contract law and concluded that, given the increased importance of arbitration as an instrument of federal policy for resolving labor-management disputes, 398 U.S. at 242–43, 90 S.Ct. 1583, Norris-LaGuardia did not prohibit the issuance of an injunction against a strike called in response to grievances which were subject to mandatory arbitration. The Court characterized its holding as a "narrow" one, *id.* at 253, 90 S.Ct. 1583, and suggested guidelines adopted from *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 228, 82 S.Ct. 1328, 1346, 8 L.Ed.2d 440 (1962) (Brennan, J., dissenting).

"A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance."

*Id.,* 398 U.S. at 254, 90 S.Ct. at 1594 (emphasis in original).

A proposed extension of *Boys Markets* was considered and rejected in *Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO, supra.* There, the activity sought to be enjoined was a sympathy strike; the employer contended that *Boys Markets* was controlling. The Supreme Court disagreed.

"*Boys Markets* plainly does not control this case. The District Court found, and it is not now disputed, that the strike was not *over* any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract. The strike at issue was a sympathy strike in support of sister unions negotiating with the employer; . . . ."

428 U.S. at 407, 96 S.Ct. at 3148 (emphasis in original).

Thus a clear distinction was drawn between a strike called in response to an arbitrable grievance, and a sympathy strike, where there is no underlying dispute between the parties to be resolved by arbitration.

This court had occasion to consider *Boys Markets* and *Buffalo Forge* in the case of *Lever Brothers Co. v. International Chemical Workers Union, Local 217, supra.* There, the union sought to enjoin the employer from permanently transferring its plant from Baltimore, Maryland, to Hammond, Indiana, pending resolution of grievance arbitration. We affirmed the grant of injunctive relief. The critical facts of Lever Brothers were these:

"Had the district court not preserved the *status quo,* [by enjoining the relocation] Lever Brothers would have *permanently transferred* their plant from Baltimore, Maryland, to Hammond, Indiana. If the union then prevailed in the arbitration, they would have had a double burden to satisfy—first, to convince the company that it should not have moved the plant to Hammond, Indiana—a *fait accompli,* and then it would have had the burden to

convince the company to move the plant back to Baltimore, Maryland. The arbitration in this sense would undoubtedly have been 'but an empty victory' for the union."

554 F.2d at 122 (emphasis in original). We distinguished the case of *Amalgamated Transit Union, Division 1384 v. Greyhound Lines, Inc.*, 550 F.2d 1237 (9th Cir. 1977) ("*Greyhound II*"), relied upon by the employer:

"In *Greyhound Lines*, the issue concerned a change of work schedules for existing employees who were employed by a bus line. Whether or not Greyhound was permitted to unilaterally alter the work schedules of its employees under the collective bargaining agreement, the employees would still be employed, and still earn wages albeit on different schedules. In his award, the arbitrator *could* subsequently alter pay schedules or revise the work schedules depending on whether he found for the union or the company and return the parties to substantially the *status quo ante.*

In the instant case, had there not been an injunction pending arbitration to preserve the *status quo*, the employees at the Baltimore plant *would have been totally and permanently deprived of their employment . . . .*"

*Id.* (emphasis in original). *Compare Hoh v. Pepsico, Inc.*, 491 F.2d 556, 560 (2d Cir. 1974).

Thus, the distinction emerged:

"An injunction to preserve the *status quo* pending arbitration may be issued either against a company or against a union in an appropriate *Boys Markets* case where it is necessary to prevent conduct by the party enjoined from rendering the arbitral process a hollow formality in those instances where, as here, the arbitral award when rendered could not return the parties substantially to the *status quo ante.*"

*Id.* at 123.

This narrow holding was consistent with the underlying rationale of *Buffalo Forge*, that the process of arbitration is preferred and the jurisdiction of the arbitrator is to

be protected. The lynchpin of *Buffalo Forge* was the Court's finding that the sympathy strike at issue would not frustrate the arbitration process. The lynchpin of *Lever Brothers* was our finding that relocation of the plant would have precisely that effect.

We now consider the facts of the instant case. Local 71 has filed seven grievances, two challenging whether Akers-Central has violated the Master Agreement by hauling general commodities in the guise of special commodities, and five concerning vacation monies alleged to be due. These facts indicate that *Boys Markets* is controlling, since there are underlying issues to be resolved by arbitration; however, the parties hotly dispute whether the employer's liquidation of part of the business is a *response* to those disputes, in the sense of a *Boys Markets* strike, or rather an independent action necessitated by business conditions.

We think that our analysis in *Lever Brothers* makes this factual dispute legally insignificant. In *Lever Brothers*, we held that a "runaway employer" could be enjoined pending resolution of arbitration, notwithstanding his motives, where failure to enjoin could render the arbitration process a "hollow formality." 554 F.2d at 123. The compelling circumstances of *Lever Brothers* are present in this case. If Akers-Central is allowed to continue its process of liquidation and disposition of assets, any victory by the union at the arbitration table may be meaningless. If the remaining terminals and vehicles are sold, there will be no jobs for re-assignment to Local 71 employees. If assets from ongoing operations are encumbered, there will be no fund from which to pay vacation monies. "[T]he arbitral award when rendered could not return the parties substantially to the *status quo ante.*" *Id.* Therefore, we hold that the grant of injunctive relief in this case was proper.

## II.

## THE DISTRICT COURT'S FACT–FINDING

■ We conclude that the district court improperly made findings of fact on

the merits of the grievances, and improperly refused to issue an order restricting use of the evidence developed through discovery at the hearing on the injunction in the subsequent arbitration proceedings. The district court found that its original order allowing such use of the record was "essential unless the proceeding before the arbitrators is to be conducted upon a policy of ignorance rather than upon a policy of relevant information."

Again we look to *Buffalo Forge* and *Lever Brothers*. In *Buffalo Forge*, the Court's refusal to extend the holding in *Boys Markets* reflected a concern that the federal courts could, in an attempt to protect the arbitrator's jurisdiction, actually encroach upon that jurisdiction.

> "This would cut deeply into the policy of the Norris-LaGuardia Act and make the courts potential participants in a wide range of arbitrable disputes    .   .   . not just for the purpose of enforcing promises to arbitrate, which was the limit of *Boys Markets*, but for the purpose of preliminarily dealing with the merits of the factual and legal issues that are subjects for the arbitrator    .   .   .."

428 U.S. at 410–11, 96 S.Ct. at 3149.

> "But this would still involve hearings, findings, and judicial interpretations of collective-bargaining contracts. It is incredible to believe that the courts would always view the facts and the contract as the arbitrator would; and it is difficult to believe that the arbitrator would not be heavily influenced or wholly preempted by judicial views of the facts and the meaning of contracts if this procedure is to be permitted.    .   .   ."

*Id.* at 412, 96 S.Ct. at 3150.

The implication is clear for the issue before us. Courts must avoid reaching the merits of arbitrable disputes; their function, within the narrow ambit of *Boys Markets* and *Lever Brothers*, is to make a determination that the underlying issues may be arbitrable, and preserve the *status quo* so that the arbitrators can first decide this preliminary issue, and then, if appropriate, decide the merits. When a collective bargaining agreement contains a mandatory arbitration clause, it reflects the parties' desire to arbitrate, not to litigate, grievances.

The court below held hearings and made findings of fact as to the arbitrable issues, as a concomitant to its determination that Local 71 satisfied the first prerequisite to the issuance of injunctive relief: a likelihood that it would prevail on the merits. But the district court misconstrued that requirement. *See United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). We held in *Lever Brothers* that "'    .   .   . a plaintiff    .   .   . need only establish that the position he will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor. If there is a genuine dispute with respect to an arbitrable issue, the barrier [to the issuance of an injunction] we believe appropriate[ly sic] has been cleared.    .   .   .'" 554 F.2d at 120, citing *Amalgamated Transit Union, Division 1384 v. Greyhound Lines, Inc.*, 529 F.2d 1073, 1077–78 (9th Cir. 1976) ("*Greyhound I*").[4]  *Contra, Hoh v. Pepsico, Inc.*, 491 F.2d at 561.

Inasmuch as the court below went too far—holding an extended hearing, developing evidence on the grievances, and making findings of fact—we find that he overstepped the limits defined in *Lever Brothers*. Incident to this, we also disapprove that portion of the district court's order which allows evidence developed at the court hearing to be used in subsequent grievance proceedings. The function of gathering and evaluating evidence is for the arbitrator. The parties agreed to this mechanism when they negotiated the mandatory grievance procedures. It is not for the courts to re-write the collective bargaining agreement.

---

4. The Ninth Circuit subsequently reconsidered and reversed its opinion, 550 F.2d 1237 (9th Cir. 1977), finding it to be in conflict with *Buffalo Forge*. As previously stated, however, we find the result in *Greyhound II* to be distinguishable, and find that the instant language in *Greyhound I* is still persuasive.

We find it unnecessary, however, to reverse and remand for correction of this portion of the order, inasmuch as the evidentiary proceedings on all grievances have been completed. In fact, we note that all of the grievances were before the arbitrators at the time the Complaint was filed in district court. Therefore, we find that any prejudice flowing from the district court's order is minimal, and decline to halt the grievance proceedings at this late stage.

### III.

## REQUEST FOR EXPEDITED ARBITRATION AND RESTORATION OF THE *STATUS QUO ANTE*

■ Local 71 took its appeal in this case to protest the district court's refusal to order, as a concomitant to its order granting an injunction, expedited arbitration on the pending grievances.[5] The court based its refusal on the terms of the collective bargaining agreement itself: the parties had negotiated and agreed upon the present system of arbitration, with its built-in potential for delay. Therefore, the court refused to, in effect, re-write the terms of that agreement. We agree with the court's conclusion that a "hands-off" approach was mandated. As the Supreme Court has said, in a context slightly different, "[o]therwise, the employer would be deprived of his bargain and the policy of the labor statutes to implement private resolution of disputes *in a manner agreed upon* would seriously suffer." *Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO,* 428 U.S. at 407, 96 S.Ct. at 3147 (emphasis added).

■ Likewise, we find no error in the district court's refusal of Local 71's request to restore the *status quo ante*—the *status quo* as of September, 1977, the time at which the union filed its first grievance. Local 71 defines *status quo* as the " 'last uncontested status which preceded the controversy . . . ,' " citing *National Association of Letter Carriers, AFL–CIO v. Sombrotto,* 449 F.2d 915, 921 (2d Cir. 1971)

(dictum) (citations omitted). But the Second Circuit termed this a "general rule," and went on to add that " . . . these generalities, like 'canons' of statutory construction, cannot be mechanically applied." *Id.* Here, the district court apparently considered the "controversy" to have begun upon the filing of the Complaint, rather than upon the filing of the first grievance. We cannot say that this determination was clearly erroneous in the district court's exercise of its discretion to fashion equitable relief.

■ In addition, the occurrences between September, 1977, and March 10, 1978, make restoration of the *status quo ante* a virtual impossibility. Tractors and trailers have been sold, as have terminals; jobs have been irreparably lost. Finally, we think that the district court correctly refused to compel Akers-Central to utilize union drivers, in order of seniority, in the special commodities operation whose validity is the subject of two of the grievances now in arbitration. To do so would, in effect, prejudge the grievances, *see Westinghouse Electric Corp. v. Free Sewing Machine Co.,* 256 F.2d 806, 808 (7th Cir. 1958), and prejudice the rights of non-union drivers employed by Akers-Central.

### IV.

## INTERSTATE COMMERCE COMMISSION JURISDICTION

■ Akers-Central contends that the injunction, which enjoined Akers-Central "and their officers, agents, servants, contractees, divisions and subsidiaries, and all persons in active concert or participation with them" from "selling, disposing of or in any manner encumbering" Akers-Central's assets, was intended to enjoin consummation of the executory contracts between Akers-Central and Smith's Transfer Corporation ("Smith's") and Arkansas-Best Freight, Inc. ("Arkansas-Best") for the sale and purchase of interstate operating au-

---

**5.** All grievances were already before the arbitrator; Local 71's concern was the slow, three-

tier system of evaluation and review. See n. 2, *infra.*

thority. We do not read the injunction to have this effect.

In October and December, 1977, the Interstate Commerce Commission authorized temporary use of the operating rights in question by Smith's and Arkansas-Best. Final approval of the sale will be given or denied after completion of litigation before the Commission. The Interstate Commerce Commission has jurisdiction to authorize or prohibit sales of operating authority, 49 U.S.C. § 5(2), and this jurisdiction is exclusive, 49 U.S.C. § 5(12). Here, the I.C.C. has already exercised its jurisdiction to grant temporary use of the operating rights; it is exercising its jurisdiction to hold hearings on the proposed sale; it may exercise its jurisdiction to grant or deny final consummation of the executory contracts. If it does in fact grant final authority to sell, Akers-Central may apply to the district court for a modification of the injunction to reflect these actions. In the meantime, Akers-Central is not enjoined from performance of the executory contracts, but is rather enjoined from prospective encumbrance of its assets. In other words, it may not enter into new executory contracts, and it is enjoined from disposing of the proceeds from those contracts already entered. We see no interference with the jurisdiction of the I.C.C. to proceed to a final determination and grant or deny finalization of the contracts with Smith's and with Arkansas-Best.

*Chicago South Shore and South Bend Railroad v. Monon Railroad,* 235 F.Supp. 984 (N.D.Ill.1964), relied upon by Akers-Central, is inapposite. There plaintiff railroad sought to enjoin defendants from making further purchases of stock in plaintiff railroad, until the I.C.C. could determine the legality of the acquisition. The court held that the I.C.C. had exclusive jurisdiction to determine whether the transfer of control was lawful. Similarly, in the instant case, we do not question the exclusive authority of the I.C.C. to determine the issue of whether the executory contracts may be finalized, and we do not attempt to enjoin Smith's or Arkansas-Best from utilizing the temporary authority which the I.C.C. has granted.

Therefore, the decision of the the district court is

*AFFIRMED.*