The INDEPENDENT OIL AND CHEMICAL WORKERS OF QUINCY, INC.,
Plaintiff, Appellant,

v.

The PROCTER & GAMBLE MANUFACTURING COMPANY, Defendant,
Appellee.

No. 88–2012.

United States Court of Appeals,
First Circuit.

Heard Nov. 4, 1988.

Decided Dec. 28, 1988.

Joanne F. Goldstein with whom Janet Linder, Boston, Mass., and Law Office of Joanne F. Goldstein were on brief for plaintiff, appellant.

Kevin P. Light with whom Choate, Hall & Stewart, Boston, Mass., was on brief for defendant, appellee.

Before BOWNES and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

* Of the District of Massachusetts, sitting by designation.

SELYA, Circuit Judge.

A labor union, the Independent Oil and Chemical Workers of Quincy, Inc. (IOCW), sued for injunctive relief in the United States District Court for the District of Massachusetts, seeking to preserve extant working conditions. The union complained that the employer, Procter & Gamble Manufacturing Co. (P & G), was on the verge of implementing changes in rules governing work shifts, safety, and employee dress in its Quincy facility. These incipient changes, the IOCW charged, would cause hardship to its members, irremediable even under the arbitration scheme provided by the collective bargaining agreement (Agreement) then in effect. The district court, following two hearings attended by briefs, arguments, and affidavits, determined that it lacked jurisdiction to issue the requested injunction. *IOCW v. P & G*, No. 88–2048–MC, slip op. (D.Mass. Oct. 3, 1988) [1988 WL 105625]. We affirm.

## I

The Agreement encompassed much of the work force at the employer's plant. It contained conventional grievance and arbitration provisions dealing with disputes over working conditions. This case presented such a dispute. In 1986, P & G began to explore restructuring its work force, looking toward increased efficiency. The key concept was the formation of "work teams" which would operate in rotating shifts, a distinct departure from existing practice. The neoteric approach contemplated that individuals would rotate among the day, evening, and red-eye shifts every two weeks. Shift swapping was to be drastically curtailed—so drastically, in fact, that the restriction was tantamount to a prohibition. All in all, the work team concept dramatically curbed the hitherto free-and-easy ability of employees to arrange and rearrange their shift assignments to accommodate their personal desires.

Following some interaction with IOCW, the depth of which is left unrevealed by the record, P & G announced in mid–1988 that, union objections notwithstanding, it would impose the changes in the near future. At the same time, the employer also announced that the rules governing employee dress were to be modified, ostensibly for safety reasons.

The union attacked on two fronts. While grieving the proposed changes, it also sued in district court. Alleging that irreparable harm was threatened because the new work rules and schedules would severely disrupt members' lives, IOCW sought to preserve the status quo pending arbitration. Its affidavits suggested that certain workers would undergo manifold privations: being forced to quit second jobs, encountering difficulties with child care, enduring physical and mental hardships, and the like. The common denominator of the variegated affidavits was the claim that, absent injunctive relief, the affiants' personal lives would be jolted and their beliefs compromised. P & G asserted that the arbitral process could adequately address—and redress—any legitimate grievances. It filed counter affidavits which framed matters in kinder and gentler terms, emphasized the long lead-time provided, and stressed the efforts that the company had made (and would be willing to make) to assist employees and ensure a comfortable transition to the new format.

The district court, mindful of the interdictory provisions of the Norris–LaGuardia Act, 29 U.S.C. §§ 101 *et seq.*,[1] took note of the circumscribed nature of its inquiry. *IOCW v. P & G*, slip op. at 1. Alluding to the evidence and arguments presented, the court held that the harms envisioned by plaintiff were insufficient to "justify ignoring the limitations imposed" by 29 U.S.C. § 101, and thus could not confer the eq-

---

1. The Act provides in pertinent part:
   No court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.
   29 U.S.C. § 101.

uitable jurisdiction necessary to grant the sought-after relief. *IOCW v. P & G,* slip op. at 2. This appeal ensued.

## II

We scrutinize a district court's decision to grant or deny a preliminary injunction under a relatively deferential glass. Absent mistake of law or abuse of discretion, we will not interfere. *E.g., In re Rare Coin Galleries of America, Inc.,* 862 F.2d 896, 900 (1st Cir. 1988); *Hypertherm, Inc. v. Precision Products, Inc.,* 832 F.2d 697, 700 (1st Cir.1987); *Massachusetts Ass'n of Older Americans v. Sharp,* 700 F.2d 749, 751 (1st Cir.1983); *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). Here, there was no misapprehension of law. The only real question is whether the district judge misused his discretion in evaluating the circumstances and calibrating the scales.

Judicial discretion is necessarily broad— but it is not absolute. Abuse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them. *See In re San Juan Dupont Plaza Hotel Fire Litigation,* 859 F.2d 1007, 1019 (1st Cir.1988); *United States v. Hastings,* 847 F.2d 920, 924 (1st Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988); *see generally Anderson v. Cryovac, Inc.,* 862 F.2d 910, 915 (1st Cir. 1988) (equating abuse of discretion with court's commission of "a meaningful error in judgment"); *In re Josephson,* 218 F.2d 174, 182 (1st Cir.1954) (similar).

## III

In this case, the judge's exercise of his discretion must be viewed against a specialized backdrop. In an arena where collec-

tive bargaining is the preferred method of dispute resolution, the nation's labor policy counsels that district courts be chary about intruding into the field. *See Local Lodge No. 1266, IAM v. Panoramic Corp.,* 668 F.2d 276, 279 (7th Cir.1981) (discussing policies of judicial restraint, voluntary arbitration, and party prerogatives). Such caution is abundantly justified by the long, sometimes tragic, history of premature judicial intervention in labor-management controversies. While we recognize that every dispute between labor and management contains the seeds of human discord, courts should intervene only when necessary to preserve the mechanisms of peaceful arbitration or when circumstances of imminent, irremediable harm threaten. *See generally Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

Given the weighty reasons supporting refrainment, it is unsurprising that restraining orders addressed to arbitrable matters are seldom to be had. The availability of injunctive relief in this context represents an exception to the strong prohibition contained in 29 U.S.C. § 101. The sole *raison d'etre* for the exception is to "enforce[ ] the obligation that the [recalcitrant party] freely undertook under a specifically enforceable agreement to submit disputes to arbitration." *Boys Markets,* 398 U.S. at 252–53, 90 S.Ct. at 1593 (footnote omitted); *see also Buffalo Forge,* 428 U.S. at 408, 96 S.Ct. at 3148.[2] Because the exception cannot be allowed to engulf the rule, it must be tightly confined. Injunctions of this sort are, quite appropriately, a rarity. Unless some plain necessity exists, the escape hatch remains shut.

With these general principles in mind, we turn to the specifics of this appeal.

---

**2.** While the roadbed of the exception is very narrow, it frames a two-way street. So long as the preconditions are met, injunctive decrees may issue against unions (as in *Boys Markets* ) and against employers (as essayed here). *See, e.g., Panoramic,* 668 F.2d at 280 (collecting cases); *see also Lever Brothers Co. v. International Chemical Workers Union, Local 217,* 554

F.2d 115, 123 (4th Cir.1976) (describing *Boys Markets* rule as "a two-sided coin"). With the cumbersome infelicity of phrase so often found in legal briefs and judicial opinions, restraining orders of this genre, when addressed to employers, have come to be known as "reverse *Boys Markets* injunctions".

## IV

In order to gain the injunction, it was incumbent upon the IOCW to demonstrate, first, that its grievance was arbitrable. *Boys Markets*, 398 U.S. at 247–49, 90 S.Ct. at 1590–92. Once that showing was made, the union had the heavy burden of satisfying equitable criteria of irreparable harm and imbalanced hardships.[3] *See, e.g., Panoramic*, 668 F.2d at 283.

The parties before us agree that the dispute underlying this case is arbitrable, and neither has disclaimed its obligation to proceed in that forum. We can, therefore, go directly to the second, more nettlesome, aspect of the inquiry. Complicating our task is a lack of uniformity in existing descriptions of the exception to 29 U.S.C. § 101. Our sister circuits seem split as to when, and under what circumstances, equity allows courts to infiltrate the *Boys Markets* environment. *Compare, e.g., Lever Brothers Co. v. International Chemical Workers Union, Local 217*, 554 F.2d 115 (4th Cir.1976) *with Amalgamated Transit Union, 1384 v. Greyhound Lines, Inc.*, 550 F.2d 1237, 1239 (9th Cir.) (on remand), *cert. denied*, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed. 2d 99 (1977). We have yet to choose between the differing formulations.

In selecting an approach to the problem, we pause for a moment at the analytic threshold. We recognize that the *Boys Markets* injunction embodies a curious legal paradox. Generally speaking, arbitration is a contractually-based device designed to permit dispute resolution without the time, trouble, trappings, and tariffs characteristic of legal actions. *See, e.g., Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2452–53, 41 L.Ed.2d 270 (1974). Virtually by definition, the scope of arbitration is in most settings restricted to matters of contract. Yet the field of labor relations has been plowed in a somewhat different furrow, for the juxtaposition between the scope of collective bargaining agreements and arbitral jurisdiction must be fashioned not under contract-law doctrine alone, but within the framework of the nation's statutory labor laws. *See, e.g., Nolde Brothers, Inc. v. Local 358, Bakery Confectionery Workers*, 430 U.S. 243, 250–55, 97 S.Ct. 1067, 1071–74, 51 L.Ed.2d 300 (1977) (citing, inter alia, the *Steelworkers Trilogy*). Therein lies the rub: in order to preserve the framework of collective bargaining, parties are sometimes thrown back to the courts. *See Boys Markets*, 398 U.S. at 249–53, 90 S.Ct. at 1591–94.

■ This antilogy, then, accounts for the stratified inquiry which *Boys Markets* prescribes. A court's burden is first to determine whether the subject of the controversy is arbitrable.[4] If not, no Norris–La-Guardia problem arises. But if so, then the courts must not interfere unless the actions taken or threatened by one of the parties would render the outcome of any arbitration which might follow meaningless. *Panoramic*, 668 F.2d at 282–83; *Lever Brothers*, 554 F.2d at 123. Elementary logic suggests this to be an appropriate point of demarcation for a very basic reason: notwithstanding the deference normally due to the arbitration agreement, a dispute-resolution mechanism which would be unable to repair the damage done by a party's unilateral actions would be useless. *Cf. Boys Markets*, 398 U.S. at 248, 90 S.Ct. at 1591. Such mechanisms would themselves become manipulable, warping the systemic balance and binding parties to inaction in the face of imminent harm. That, then, represents the frontier past which

---

3. In general, we have characterized the elements which must be considered in connection with a request for interlocutory injunctive relief as embodying (1) likelihood of success on the merits; (2) potentiality for irreparable injury; (3) a balancing of the relevant equities (most importantly, the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld); and (4) the effect on the public interest. *See Hypertherm*, 832 F.2d at 699 n. 2; *Planned*

*Parenthood League*, 641 F.2d at 1009. In the *Boys Markets* environment, arbitrability replaces the fourth factor entirely, and tends to preempt the first.

4. In so doing, it is axiomatic that all "[d]oubts should be resolved in favor of" arbitrability. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960).

judicial intervention seems justified; the need to prevent the siren song of open labor-management warfare from becoming an industrial anthem demands that courts not permit one party to turn the other into an unwilling Ulysses.

The Ninth Circuit's interpretation of the Norris–LaGuardia exception runs afoul of these prudential principles. *Amalgamated* has as its premise what amounts to a lop-sided vision of the covey of obligations arising in connection with collective bargaining pacts. Under such a view, an arbitration clause implicitly binds the union not to strike, but does not implicitly bind the employer to preserve the status quo. *Amalgamated Transit Union*, 550 F.2d at 1239. By requiring "an express [ ]or implied in fact promise ... to preserve the status quo ..." in order to warrant an injunction, *id.*, the court has added another story to the edifice erected by the Congress —and in the process, tilted the structure's delicate balance. The asymmetry of this promissory rule appears to contravene, at least implicitly, the equipoise between labor and management which Congress sought to forge and which the Court elaborated in *Boys Markets*. The underlying rationale of labor peace, facilitated by an arbitral process equally preservable by either party, is in our opinion best served when juridical power may be invoked both sparingly and symmetrically. We therefore reject the essentially epibolic *Amalgamated* approach and embrace instead the adaptation of traditional equitable standards articulated by the Fourth Circuit in *Lever Brothers*.[5]

Having chosen our approach, we expound on it briefly, and then proceed to apply it to the case at bar. In *Lever Brothers*, the panel upheld a preliminary injunction which "preserved a status of neutrality so the parties could arbitrate the[ir] underlying differences...." 554 F.2d at 122. Failure to maintain the status quo, the court noted, would have allowed the company to complete its planned maneuver (in that case, moving the facility out of state), thus presenting the union with a *fait accompli. Id.* In short, the factual situation was sufficiently compelling that the trial court could understandably conclude that arbitration, unassisted by a status quo injunction, would be no more than "a hollow formality." *Id.* at 123. That phraseology is, we suggest, consistent with the theme which dominates the caselaw. *See Panoramic*, 668 F.2d at 283 (injunction may issue if, without one, arbitration would be reduced to "a meaningless ritual"); *Nursing Home & Hospital Union No. 434 v. Sky Vue Terrace, Inc.*, 759 F.2d 1094, 1099 (3d Cir.1985) (same); *see also American Postal Workers Union v. United States Postal Service*, 766 F.2d 715, 722 (2d Cir.1985) (court may issue restrainer if, otherwise, arbitral success would be "but an empty victory") (citations omitted), *cert. denied*, 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986); *Teamsters Local Union No. 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1336, 1341 (4th Cir.1978) (same), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979). Put another way, judicial intervention was acceptable in *Lever Brothers* because "the injunction preserved the *status quo* in order to save the arbitration clause." 554 F.2d at 119 (italicization in original).

■ In the instant case, however, the record suggests that the district court confronted a very different kind of problem. There was no cogent reason to believe that an arbitral victory for the union—should one ensue—would necessarily be thwarted by changed circumstances. It remained altogether conceivable (indeed, quite likely) that an arbitrator could restore the work schedules and dress requirements that existed beforehand. Such relief, though not as satisfactory as freezing the status quo, would be far from meaningless. *See, e.g., Lever Brothers*, 554 F.2d at 122.

To be sure, IOCW claims that, though the clock might be rolled back, the interim

---

5. Even if we were to adopt the Ninth Circuit's outlook, it would not avail the IOCW. In this case, P & G made no explicit promise to preserve the status quo, nor can we infer one.

Absent such an express or implied assurance, the district court, under the Ninth Circuit's formulation, would have been well-advised to refuse the injunction.

harm to its members could not be repaired. Were the status quo provisionally altered, success before the arbitrator would in the union's view yield, at best, bittersweet fruit. But such an argument seems doubly flawed. First, it blurs the focus of the rule. In *Lever Brothers*, an arbitral triumph would have been meaningless because workers would have been "restored" to non-existent jobs, that is, they *"would have been totally and permanently deprived of their employment ...."* *Id.* (emphasis in original). That result, not the potential interim disruption in the employees' lives, motivated the court. Here, there was little reason to believe that an order reinstating the former schedules and dress codes would not effectively restore the status quo ante, despite the derangement betweentimes.

Second, though the prospect of a Cadmean victory might, in an extreme case, be enough to animate the court's equitable powers, the determination as to whether a particular set of harms reach this level is a case-specific one, largely committed to the factfinder. We abjure the notion that we should attempt to set the threshold of pain as a matter of law. We recognize that some turbulence will attend the inauguration of the work team concept and the related changes in schedules and dress. Disruption of child care arrangements or creation of a conflict with the demands of a second job, to cite two examples drawn from plaintiff's affidavits, certainly can prove to be wrenching experiences. But the mere presence of such elements does not entitle every employee-suitor to interim relief as an absolute matter. Dislocations invariably attend any modification in working conditions. If disruption of workers' lives and habits was deemed sufficient harm on which to bottom injunctive relief, then the exception would swallow the rule, and the courts would be mired hip-deep in matters which Congress intended to remit to an arbitral forum.

Given that overview, the findings below are dispositive. The court concluded that this was not "a case in which a 'compelling factual situation' (such as the sale of the defendant's operation and distribution of its assets) would effectively make arbitration a nullity." *IOCW v. P & G*, slip op. at 2. The district judge plainly thought that the degree of dislocation was not so intolerable as to justify departing from the important policies which underlie 29 U.S.C. § 101. The conclusion, we think, is a supportable one.

■ In this respect, we note first that a restraining order was not necessary "to save the arbitration clause." *Lever Brothers*, 554 F.2d at 119. That being so, the district court would have had to ask whether equity required the injunction, notwithstanding that the arbitral process was in no danger of being reduced to a charade. *See Panoramic*, 668 F.2d at 284–89; *Columbia Local, American Postal Workers Union v. Bolger*, 621 F.2d 615, 618 (4th Cir.1980); *Pittsburgh Newspaper Printing Pressmen's Union No. 9 v. Pittsburgh Press Co.*, 479 F.2d 607, 608–09, 610 (3d Cir.1973); *cf. United Steelworkers of America v. Textron, Inc.* 836 F.2d 6, 7–10 (1st Cir. 1987) (upholding injunction pending trial on the merits).

Having clearly asked the right question, the court's answer to it seems well within the universe of acceptable responses. Fairly read, there is enough evidence in the record to support the finding that the union failed to demonstrate irremediable injury. *Compare Panoramic*, 668 F.2d at 286–87 (injunction upheld where sale of division would result in permanent loss of employment; restoration of jobs would have been beyond arbitrator's power); *Postal Workers*, 621 F.2d at 618 (injunction vacated where work shift eliminated but job security remained, despite threats to seniority, time off, vacation and "convenience factors"); *Pittsburgh Press*, 479 F.2d at 610 (refusal to issue injunction affirmed even though shift reduction allegedly yielded decreased working time, apprenticeships, and pension funding).

Here, the potential harms, though serious, did not rise to the *Panoramic* level: irretrievable loss of workers' primary employment. Some employees perhaps stood to lose the income of second, non-P & G,

jobs; others would have had to engineer substantial rearrangements in their personal lives and undergo some strain. Whether these dislocations might have been enough to *permit* granting injunctive relief is not the question; what counts is that their presence lacked sufficient force to *compel* such a result. The situation faced by the IOCW's membership more closely resembles *Postal Workers* and *Pittsburgh Press* (cases where the alleged harm, while palpable, fell short of warranting interlocutory injunctions) than *Panoramic* and *Lever Brothers* (cases where the severity of the foreseeable harm justified interim injunctive relief).

We need not forcefeed the point. It was the district court's duty—and its prerogative—to assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications. On this record, the complaint that the court below was derelict in performing this duty will not wash. Its declination to assume jurisdiction seems sustainable: there was no error of law, and the stratum of factual circumstances within which deference is due to the trier's evaluation was not breached.

### V

We summarize succinctly. Mindful that the labor injunction has itself been a powerful disrupter of labor relations, we are reluctant judicially to enlarge the exception to 29 U.S.C. § 101. To the precise contrary, a triumvirate of elements—faithfulness to Congress' intent, adherence to precedent, and sweet reason—convince us that the historic barriers impeding too-free use of injunctions in cases of this sort should remain intact.

On that note, the matter is easily resolvable. The district court found, in effect, that arbitration—a process which the parties bargained for originally and to which they have continuing access—can adequately meet IOCW's legitimate concerns. The court likewise found no pressing need for judicial intrusion at this stage of the labor dispute. It has not been shown that the judge overlooked relevant factors which should have been given significant weight, or that he considered any inappropriate factors, or that he made a serious error in weighing and balancing the elements which he properly synthesized into the mix.

We need go no further. It cannot be said that error prevailed.

*The order of the district court denying plaintiff's renewed motion for preliminary injunctive relief must be affirmed.*