**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL UNION NO. 251**

v.

**ALMAC'S INC. d/b/a Rhode Island Produce Company.**

**Civ. A. No. 89-0602 P.**

United States District Court,
D. Rhode Island.

Nov. 6, 1989.

Richard Peirce, of Roberts, Carroll, Feldstein & Tucker, Providence, R.I., for plaintiff.

Walter Hunter, of Edwards & Angell, Providence, R.I., for defendant.

MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

The International Brotherhood of Teamsters, Local No. 251 seeks injunctive relief barring Almac's Inc. transfer of its distribution operations from the Rhode Island Produce Company to Wetterau, Inc., pending an arbitral decision on the union's

grievance over the move.[1] Both parties are willing to go to arbitration, but Almac's will not halt the transfer while the arbitrator entertains the union's grievance. This Court held a hearing November 3 on the union's initial request for a temporary restraining order. There, both parties agreed that the hearing, involving testimony from both sides, would provide sufficient information for this court to issue a preliminary injunction.

### Background

Almac's is a supermarket chain operating 36 stores in and around Rhode Island. Rhode Island Produce Company is the distribution center for all the produce, and most of the other goods, sold in Almac's stores. Until recently, Almac's buyers would purchase goods from a variety of sellers and have them shipped to the produce company's warehouse in East Providence. Then, as the need arose, the goods would be distributed to the various Almac's stores. The union and the produce company have operated under a collective bargaining agreement for over twenty years. They signed the latest agreement in 1987. It runs to 1991.

On October 5, 1989, Almac's gave written notice to the union that it intended to lay off the employees at, and eventually close, the Rhode Island Produce Company distribution center. The company's notice satisfied the provisions of the Worker Adjustment and Retraining Notification Act.[2] Under that federal law, Almac's cannot layoff any employees or shut down the produce company until December 5, 60 days after the notice.[3]

Almac's is closing the produce company because it has agreed to transfer the distribution operation and sell the produce company's assets to Wetterau, Inc. Once the sale is complete, Wetterau would supply Almac's. There will be a gradual switch to Wetterau, completed at about the same time Almac's obligation to pay the produce company's employees under federal law expires. Wetterau is now supplying five Almac's and is covering any shortfalls that occur at the other stores. Under its agreement with Almac's, Wetterau was to supply five more stores this week, five more next week, and so on. By December, Wetterau would supply all Almac's stores. Then, there would be nothing left for the Rhode Island Produce Company to do. Wetterau has stated to the Union and Almac's that it does not intend to abide by the collective bargaining agreement the union has with the Rhode Island Produce Company. It will consider hiring the produce company employees at its own warehouses, without regard to any seniority the employee may have at the produce company.

The union opposes the move and wants its grievance heard by an arbitrator as it claims the collective bargaining agreement mandates. The agreement binds "the parties [the union and the produce company] hereto, their heirs, successors, administrators, executors and assignees." Collective Bargaining Agreement at 1. Local 251 argues Almac's proposed transfer violates three provisions in the collective bargaining agreement. In the language at the core of this dispute, the agreement states,

> In the event an operation is sold, leased, trasferred or taken over by sale, transfer, lease or assignment, ... such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof.

Id. at 2. Moreover, Almac's, because it assumed the produce company's obligations under the contract, agreed not "to hire any outside truckers when it has available equipment of its own" and not "to hire any outside trucks except to supplement its own equipment when such equipment is in

---

1. Almac's Inc., a Delaware corporation, bought the assets of Almac's, Inc., a Rhode Island corporation, and Rhode Island Produce Company in July, 1989. The new consolidated company has accepted the Collective Bargaining Agreement between the union and the Rhode Island Produce Company.

2. Pub.L. No. 100–379, 102 Stat. 890 (1988) (to be codified at 29 U.S.C. §§ 2101–09).

3. See id. § 3, 102 Stat. at 891 (to be codified at 29 U.S.C. § 2102).

full use." *Id.* Article XXII, at 29. Almac's asserts that it did not violate the agreement because it had no specific obligation under the contract to condition the sale of the Rhode Island Produce Co. on Wetterau's acceptance of the collective bargaining agreement. Covering the disputes is a broad arbitration clause. "Any grievance relating to the interpretation of this Agreement which arises during the term of the Agreement" is subject to a two step grievance process. If that process does not lead to a settlement, the parties agree to send the dispute to an arbitrator. *Id.* Article XX, at 25–26. The union initiated the grievance procedure, but the dispute remains unresolved.

The arbitrator would have to decide whether the contract requires Almac's to continue using the produce company until either Wetterau or some other buyer agrees to abide by the collective bargaining agreement. If the arbitrator does not act before December 5, a distinct possibility, the jobs of 180 employees at Rhode Island Produce Company will be lost and $15 million in inventory will be dissipated. The union wants this Court to issue a preliminary injunction to maintain the status quo while the arbitrator hears the case.

### Injunctions and Arbitration

■ A court must tread lightly when a party asks for injunctive relief in a labor dispute in light of the proscriptions of the Norris–LaGuardia Act, 29 U.S.C. §§ 101–15 (Supp. IV 1986). As the First Circuit re-

cently observed, however, a court can intervene "to preserve the mechanisms of peaceful arbitration." *Independent Oil & Chemical Workers of Quincy, Inc. v. Proctor & Gamble Mfg. Co.,* 864 F.2d 927, 929 (1st Cir.1988). The Court in *Independent Oil* also cautioned, however, that "the exception cannot be allowed to engulf the rule.... Injunctions of this sort are, quite appropriately, a rarity. Unless some plain necessity exists, the escape hatch remains shut." *Id.*

■ Local 251 faces a demanding standard before it can benefit from a preliminary injunction.[4] It must show that it will suffer irreparable harm if this Court does not issue the injunction, *see Independent Oil,* 864 F.2d at 930; *Lever Bros. Co. v. International Chemical Workers Union,* 554 F.2d 115, 119 n. 6 (4th Cir.1976), and that it "will suffer more from the denial of an injunction than will the employer from its issuance." *Local Lodge No. 1266 v. Panoramic Corp.,* 668 F.2d 276, 288 (7th Cir.1981); *see Independent Oil,* 864 F.2d at 930.[5]

■ Should this Court refrain from granting an injunction, the union and Almac's will arbitrate the union's grievance. But at the same time, Almac's will transfer the distribution operation to Wetterau, finishing the process in December. The arbitrator would therefore have to hear and decide the union's grievance in less than a month. After December 5, Almac's implic-

---

**4.** Both parties agree that the union's grievance is arbitrable, therefore satisfying the first requirement in *Independent Oil.* *See Independent Oil,* 864 F.2d at 930.

**5.** Normally, to grant a preliminary injunction, a court must also determine that Local 251 has a likelihood of succeeding on the merits and that the public interest supports the issuance of an injunction. If a court concludes that the issue is arbitrable, however, it has determined that the injunction, by promoting arbitration, satisfies the public interest. *See Independent Oil,* 864 F.2d at 930 n. 3. Moreover, Local 251 has shown a likelihood of succeeding because a sufficiently genuine dispute over an arbitrable issue exists. *See Panoramic Corp.,* 668 F.2d at 285 (quoting *Amalgamated Transit Union v. Greyhound Lines, Inc.,* 529 F.2d 1073, 1077–78 (9th Cir.), *vacated and remanded,* 429 U.S. 807,

97 S.Ct. 43, 50 L.Ed.2d 68 (1976)). The company argues that Local 251 has no chance of being successful before the arbitrator because the bargaining agreement does not impose a specific duty on Almac's to make assumption of the agreement a condition of its transfer and sale of the produce operation to Wetterau. This Court cannot interpret the terms of the contract, a task it must leave for the arbitrator. *See AT & T Technologies, Inc. v. Communications Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986). But this Court holds the union has shown the plain language of the agreement imposes such a duty through the successors and assigns clause of the contract, read together with the provision subjecting the produce company to the agreement regardless of its sale, lease, transfer, or assignment.

itly admits that it will begin layoffs at the produce company, endangering the jobs of 180 employees. The harm faced by the union is indeed serious and irreparable; a real possibility exists that the arbitrator's decision will not be handed down by December 5 and, even if it is in favor of the union, will " 'be but an empty victory.' " *Panoramic Corp.*, 668 F.2d at 286 (quoting *Brotherhood of Locomotive Engineers v. Missouri–Kansas–Texas Railroad*, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960)). As the First Circuit instructs, "the courts must not interfere unless the actions taken or threatened by one of the parties would render the outcome of any arbitration which would follow meaningless.... [A] dispute-resolution mechanism which would be unable to repair the damage done by a party's unilateral actions would be useless." *Independent Oil*, 864 F.2d at 930.

The factual situation here is akin to that in *Lever Bros.* or *Panoramic.* In *Lever Bros.*, the company proposed to shut down its Baltimore, Maryland, soap plant and transfer the operation to a Hammond, Indiana, plant represented by a union different from the International Chemical Workers. *See Lever Bros.*, 554 F.2d at 117. In *Panoramic*, the company planned to sell one of its divisions to investors who would terminate all the employees, requiring them to reapply for their jobs, and who refused to assume the company's obligations under the collective bargaining agreement or recognize or bargain with the union. *See Panoramic Corp.*, 668 F.2d at 277–79. Both courts concluded that the union would be irreparably harmed if an injunction did not bar the company action, pending completion of arbitration. As *Lever Bros.* stated, "[H]ad there not been an injunction pending arbitration to preserve the *status quo*, the employees at the Baltimore plant *would have been totally and permanently deprived of their employment*, and ... if the union prevailed at the arbitration, would have had a double burden of convincing the company not only not to move, which it had already done, but to return [to] the plant." *Lever Bros.*, 554 F.2d at 122. Moreover, the union does not

necessarily have an adequate remedy at law. *See Panoramic Corp.*, 668 F.2d at 288 ("Where ... employer action threatens a permanent loss of jobs, a damage remedy is inadequate."). Here, this Court is convinced that Almac's will begin layoffs in December, unless this Court or the arbitrator acts. The union, if it wins in arbitration after the transfer is complete, would have the same burden as the union in *Lever Bros.* Armed with the arbitrator's award, it would have to convince Almac's to terminate the all-but-complete transfer to Wetterau, return to the produce company's warehouse, and rehire the terminated employees.

Local 251 faces a more serious deprivation than did either the union in *Independent Oil* or *Amalgamated Transit Union v. Greyhound Lines*, 550 F.2d 1237 (9th Cir.), *cert. denied*, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977). In *Independent Oil*, the company proposed a restructuring of its work force at its Quincy, Massachusetts, facility and a modification of the rules covering employee dress. *See Independent Oil*, 864 F.2d at 928. The court concluded, "There [is] no cogent reason to believe that an arbitral victory for the union—should one ensue—would necessarily be thwarted by changed circumstances. It remained altogether conceivable (indeed, quite likely) that an arbitrator could restore the work schedules and dress requirements that existed beforehand. Such relief ... would be far from meaningless." *Id.* at 931. Similarly, in *Greyhound*, the company proposed a work schedule change. As *Lever Bros.* correctly stated, "Whether or not Greyhound was permitted to unlaterally alter the work schedules of its employees under the collective bargaining agreement, the employees would still be employed, and still earn wages albeit on different schedules. In his award, the arbitrator *could* subsequently alter pay schedules or revise the work schedules depending on whether he found for the union or the company and return the parties to substantially the *status quo ante*." *Lever Bros.*, 554 F.2d at 122. In contrast, practical difficulties could make an arbitrator

loath to reverse the substantially completed transfer and sale of the produce company to Wetterau. *See Panoramic Corp.,* 668 F.2d at 287. An order to reinstate the terminated employees and restart the warehouse operation would require Almac's to expend $15 million in purchasing new inventory and perhaps lead to an interruption in service to Almac's stores. The employees may have already found alternative employment. An injunction to suspend the transfer of the produce company to Wetterau would therefore preserve the options available to the arbitrator.[6]

The balancing of the hardships in this case also supports the issuance of an injunction. Almac's makes dire predictions about the consequences of an injunction that this Court finds hard to believe. Almac's states that, if the transfer to Wetterau is halted, its stores would suffer immediate shortages, customers would flee, and "the Company would probably go out of business within a matter of weeks." Defendant's Memorandum at 14. Almac's, however, has $9–12 million of inventory at its disposal to supply its stores. Normally, the produce company's warehouse holds $12–15 million in inventory. In anticipation of the consumation of its deal with Wetterau, Almac's has used about $3 million of its inventory. Moreover, Almac's admitted it could use Wetterau, as it is doing now, to cover any shortages until it can fully restock the produce company's stores. The financial hardship, if any, would be slight.

Weighed against Almac's claim is the certainty that should this Court refrain from granting injunctive relief, and Almac's completes the transfer before the arbitrator's decision, approximately 180 employees will be out of work. Given that consideration, this Court agrees with the court in *Panoramic* that "this showing of injury to the Union and its members outweighs whatever financial injury [the company] will suffer in these circumstances as a result of the injunction." *See Panoramic Corp.,* 668 F.2d at 288. Moreover, Almac's is protected against any loss, should an appellate court rule that this Court's injunction was wrongly decided, by the bond Local 251 must pledge pursuant to Fed.R.Civ.P. 65(c) and 29 U.S.C. § 107.

### Conclusion

Having found that the grievance is arbitrable, the union will suffer irreparable harm, and the equities weigh in favor of the union, this Court issues a preliminary injunction forbidding Almac's, Inc., from taking any steps to transfer its distribution operation from Rhode Island Produce Co. to Wetterau, Inc., and from laying off any members of Local 251's bargaining unit at Rhode Island Produce Co. The injunction shall run until an arbitrator can hear the union's grievance and issue a decision. Pursuant to 29 U.S.C. § 107 and Fed.R. Civ.P. 65(c), Local 251 shall file a bond in an amount to be determined by mutual agreement of counsel. If counsel cannot agree, they shall petition this court immediately.

---

6. The company asserts that the court in *Panoramic Corp.* only enjoined the sale of the company's assets, not the termination of its employees, claiming that the employees could obtain adequate relief through an arbital award of reinstatement. The relief was adequate, however, only because the court preserved Panoramic's assets: "Having enjoined the sale, it was simply unnecessary also to enjoin the discharges." *See Panoramic Corp.,* 668 F.2d at 288 n. 15. Here, unless this Court enjoins Almac's, the company will use up the remaining inventory in the produce company's warehouse, leaving the shelves bare. This Court, to maintain the status quo, must therefore enjoin Almac's from depleting the warehouse.