135 F.3d 58
 75 Fair Empl.Prac.Cas. (BNA) 1838,
72 Empl. Prac. Dec. P 45,253
Vincent DeNOVELLIS, Plaintiff, Appellant,
v.
Donna E. SHALALA, Secretary of Health and Human Services,
Defendant, Appellee.
Paul H. KELLEY, Plaintiff, Appellant,
v.
Donna E. SHALALA, Secretary of Health and Human Services,
Defendant, Appellee.
Laurentina JANEY-BURRELL, Plaintiff, Appellant,
v.
Donna E. SHALALA, Secretary of Health and Human Services,
Defendant, Appellee.
 Nos. 97-1090 to 97-1092.
 United States Court of Appeals,
First Circuit.
 Heard Sept. 3, 1997.
Decided Jan. 29, 1998.
 
 Phyllis Fine Menken, Charlestown, MA, for appellant Janey-Burrell.
 Jodie Grossman, Boston, MA, for appellants DeNovellis and Kelley.
 John A. Capin, Assistant U.S. Attorney, with whom Donald K. Stern, United States Attorney, Boston, MA, was on brief, for appellee.
 Before STAHL, Circuit Judge, BOWNES, Senior Circuit Judge, and LYNCH, Circuit Judge.
 LYNCH, Circuit Judge.
 
 
 1
 During the course of a nationwide restructuring of the United States Department of Health and Human Services (HHS) in 1996, the Administration for Children and Families reorganized its ten regional offices into five major "hub" offices and adjunct offices. Although Boston has been affectionately referred to as the "Hub of the Universe," the Boston field office lost out to larger urban centers and was not designated a hub office. As a result, the Boston office was directed to shrink its size, and did so by reorganizing from two levels of managerial employees to one, accomplishing this by eliminating its middle management positions. Five middle management employees in the Boston office were given the option of either accepting a demotion or laterally transferring to the same positions at locations other than Boston.
 
 
 2
 Three of these employees, Vincent DeNovellis, Paul Kelley, and Laurentina Janey-Burrell, sued HHS for violations of Section 704 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-34, and the Civil Service Reform Act of 1978 (CSRA), Pub.L. No. 95-454, 92 Stat. 1111 (codified as amended in various sections of 5 U.S.C.), saying that the proposed reassignments constituted illegal age discrimination by forcing them to retire prematurely, and that HHS violated the CSRA by failing to follow proper procedures for a reduction-in-force. Janey-Burrell and DeNovellis also said that the reassignment decisions were made in retaliation for prior EEO claims they had filed which alleged racial discrimination by their supervisor.
 
 
 3
 The plaintiffs have chosen as their battlefield the equitable plains of preliminary injunctive relief, and there they falter. All three lost in their applications before the district court for issuance of preliminary injunctions under Fed.R.Civ.P. 60(b). Although Janey-Burrell obtained from a different district court judge, under Fed.R.Civ.P. 62(c), a stay pending appeal of the denial of the preliminary injunction, which the parties have treated as freezing Janey-Burrell into her pre-reassignment position pending this appeal, that stay is not the subject of this appeal--nor could it be by its own terms. This appeal is from the denial of the preliminary injunctions under Fed.R.Civ.P. 60(b). In the interim, DeNovellis and Kelley have retired.
 
 
 4
 We affirm. The claims of DeNovellis and Kelley for preliminary injunctive relief are now moot because of their retirement. As for Janey-Burrell, the district court did not abuse its discretion in denying the injunction.
 
 
 5
 * We describe the facts as to Janey-Burrell; we need not discuss DeNovellis and Kelley because their claims are moot.
 
 
 6
 In 1993, Vice President Gore instituted the National Performance Review, which attempted to make federal agencies more cost-efficient and responsive to the public. Many HHS agencies have since undergone extensive review and reorganization, including the Administration for Children and Families (ACF), which administers over sixty federal human service programs, including Head Start and Aid to Families with Dependent Children. In 1994, HHS initiated a plan to streamline the ACF bureaucracy by reducing the number of administrative centers from ten regional offices to five hub offices. The five regional offices not selected as hub offices, including Boston, were directed to eliminate management positions and reorganize so they would have one level of management instead of the extant two levels. In October 1994, the Boston office implemented a plan to reorganize into five goal-driven work-groups in accordance with the five goals of the ACF reorganization plan. The five goal leaders and the Deputy Regional Administrator now comprise the sole management level at the Boston ACF office. The five goal leaders and the Deputy Regional Administrator are all over forty years of age.
 
 
 7
 Plaintiff Janey-Burrell was a mid-level manager at ACF at the GS-14 level prior to the reorganization. In November 1993, Janey-Burrell had filed an EEO complaint against her supervisor, Regional Administrator Hugh Galligan, and the Assistant Regional Administrator, Richard Stirling, alleging race and gender discrimination. In April 1994, Regional Administrator Hugh Galligan reassigned Janey-Burrell from her position of record to a temporary assignment without specific duties. In July 1994, Janey-Burrell filed a second EEO complaint against Galligan when he placed her on temporary assignment, alleging that this action was in retaliation for having filed her first EEO complaint. In October 1994, when the Boston regional office implemented its reorganization plan, Janey-Burrell was not chosen to be a goal leader. Along with the other mid-level managers not selected to be goal leaders, Janey-Burrell was permanently placed on temporary assignment pending reassignment to another permanent position within the agency. Janey-Burrell was assigned to the Office of Regional Director Philip W. Johnston, where she served as the Department's Violence Prevention and Community Based Program Coordinator.
 
 
 8
 During 1995 and 1996, in order to continue the streamlining process, the Boston office sought volunteers to relocate to other offices around the country. Four employees volunteered to relocate, but Janey-Burrell did not. This left five GS-14 mid-level managers remaining within the Boston office who had not been chosen to be goal leaders and whose positions were being eliminated by the reorganization. In June 1996, Diann Dawson, the ACF Regional Operations Director, decided to impose "directed reassignments" on those five remaining GS-14 mid-level managers, including Janey-Burrell, to equivalent positions in the hub offices around the country.
 
 
 9
 On June 11, 1996, Dawson wrote a letter to the five middle-managers in which she proposed their reassignment to different locations. Dawson's letter to Janey-Burrell proposed that Janey-Burrell fill a vacancy in the ACF office in San Francisco. The others were asked to fill vacancies in Chicago, Dallas, New York, and Atlanta. Dawson requested that Janey-Burrell and the others respond to the proposed reassignments within fifteen days of receipt of the letter. Janey-Burrell responded by letter on June 24, 1996, in which she rejected the reassignment. Among her reasons was that it would be harder for her to pursue her EEO claims against Galligan were she in San Francisco instead of Boston.
 
 
 10
 On July 9, 1996, Janey-Burrell received Dawson's response. Dawson said she had received Janey-Burrell's letter and had considered Janey-Burrell's objections to reassignment. Dawson wrote she had nevertheless decided to reassign Janey-Burrell to San Francisco effective August 18, 1996.
 
 
 11
 On August 13, 1996, Janey-Burrell was offered the option of staying in Boston. Before this date, one mid-level manager had enquired as to whether she could stay in Boston if she took a downgrade to a non-supervisory GS-13 position. This request was granted and Galligan, unsolicited, wrote a letter to Janey-Burrell notifying her that this had happened. He concluded, "If you are interested in doing the same, let me know." For Janey-Burrell, this downgrade would have allowed her to stay in Boston in a GS-13 position at a $13,000 reduction in annual pay. On August 16, 1996, Janey-Burrell filed a complaint with the district court seeking a temporary restraining order and preliminary injunctive relief to prevent her reassignment. Chief Judge Tauro granted the temporary restraining order.
 
 
 12
 On September 30, 1996, Judge Saris denied plaintiff's application for a preliminary injunction. Plaintiff filed a notice of appeal and a motion for stay pending appeal under Fed.R.Civ.P. 62(c). On November 22, 1996, the motion was heard by Judge Gertner, to whom the case had been transferred, who granted the stay pending appeal.[1] Janey-Burrell has remained in her GS-14 supervisory position since that time, even though ACF has otherwise completed its reorganization. The defendants have informed this court that the choice of going to San Francisco or remaining in Boston as a GS-13 employee is still open to her.
 
 II
 
 13
 Janey-Burrell's claim fails for a number of reasons. As the district court found, she has not demonstrated irreparable injury and, save for her civil service claims (as to which she has not exhausted her administrative remedies), she has not demonstrated probability of success on the merits. We do not reach the other criteria for injunctive relief.
 
 A. Preliminary Injunction Standard
 
 14
 We repeat and apply here the familiar standard for issuance of preliminary injunctive relief. A district court must weigh four factors: (1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, i.e., the hardship to the nonmovant if the injunction issues as contrasted with the hardship to the movant if interim relief is withheld; and (4) the effect on the public interest of a grant or denial of the injunction. See Gately v. Massachusetts, 2 F.3d 1221, 1224 (1st Cir.1993). The party appealing a grant or denial of a preliminary injunction bears the heavy burden of showing that the district court committed a mistake of law or abused its discretion. See id. at 1225.
 
 
 15
 This case implicates two related standards for the issuance of injunctive relief in employment law cases. The first standard governs issuance of injunctive relief on claims by federal government employees that their civil service rights have been violated. This is controlled by Sampson v. Murray, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), which requires a very strong showing of irreparable injury. This strong showing is on account of the "well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." Id. at 83, 94 S.Ct. at 949 (citation and internal quotation marks omitted). Sampson stands for the proposition that, before enjoining a government agency from dismissing a civil service employee who has not exhausted her administrative remedies, a court must find that the facts underlying the employee's allegations of irreparable harm are genuinely extraordinary. See Gately, 2 F.3d at 1232; see also, Chilcott v. Orr, 747 F.2d 29 (1st Cir.1984) (applying Sampson in denial of injunction sought by plaintiffs being discharged from Air Force who did not first seek relief before appropriate Air Force administrative boards); cf. United States v. Fausto, 484 U.S. 439, 454-55, 108 S.Ct. 668, 677-78, 98 L.Ed.2d 830 (1988) (applying similar principles in claim for back pay); Bush v. Lucas, 462 U.S. 367, 388-389, 103 S.Ct. 2404, 2416-17, 76 L.Ed.2d 648 (1983) (applying similar principles in claim to reverse demotion).
 
 
 16
 The second standard governs issuance of injunctive relief in discrimination claims brought by government employees where no civil service claim is involved. In this circuit, this is controlled by Gately, which does not require as high a showing of irreparable harm as Sampson. That is because of the different policies and circumstances that attend discrimination cases, particularly where no interests in protecting the processes of the civil service system are involved. See Gately, 2 F.3d at 1233-34.[2]
 
 
 17
 Gately holds that a government-employee plaintiff may obtain injunctive relief, in the district court's discretion, upon demonstrating sufficient irreparable harm, taking into consideration "the wide latitude traditionally granted the government in dispatching its own internal affairs." Gately, 2 F.3d at 1234. In contrast, here, we are faced with the question of whether the district court abused its discretion in refusing to grant injunctive relief against the government--a much easier question.
 
 
 18
 In this case involving both civil service claims and discrimination claims, the question may arise whether Sampson or Gately presents the proper standard for a district court to apply.[3] We need not consider this question until it is squarely before us. Even under the lesser Gately standard, the district court was well within its discretion in refusing to grant a preliminary injunction against the government in this case.
 
 B. Irreparable Injury
 
 19
 On appeal, Janey-Burrell bases her claim of irreparable injury on five grounds: she will suffer a salary loss of $13,000 if she stays in Boston; she will suffer emotional distress; there will be a loss of prestige; her ability to work with counsel on pursuit of her claims will be impaired if she is in San Francisco; and the lack of an injunction will have a chilling effect on others who would understand this job action to be in retaliation for her complaints of discrimination. Neither in sum nor in individual parts do these factors amount to irreparable injury on the facts of this case.
 
 
 20
 We start with the obvious. It is Janey-Burrell's choice whether she accepts the transfer to San Francisco or whether she remains in Boston at a reduced salary. If she accepts the transfer, there is no diminution in pay or loss of status. If she stays in Boston, she will suffer a diminution in pay, but will recover all of that pay and perhaps other damages if she prevails on the merits. Even under traditional Rule 65 standards, a temporary loss of income which may be recovered later does not usually constitute irreparable injury. See Sampson, 415 U.S. at 89-92, 94 S.Ct. at 952-54; Gately, 2 F.3d at 1232.
 
 
 21
 In addition, while Janey-Burrell may recover compensation for her emotional distress claim if she prevails on the merits, the fact that an employee may be psychologically troubled by an adverse job action does not usually constitute irreparable injury warranting injunctive relief. See Soldevila v. Secretary of Agriculture, 512 F.2d 427, 430 (1st Cir.1975). Janey-Burrell's assertion that she will suffer a loss of status, even if true, is also insufficient to show irreparable injury, as HHS has given her a perfectly plausible explanation as to the reasons for the job action. This case, where a plausible explanation for the job loss is given, is considerably weaker than Sampson, where no explanation was given and the harm to reputation from an unexplained discharge was not enough to create irreparable injury.
 
 
 22
 We are left with the arguments about chilling effect and interference with the ability to work with counsel. The breadth of these arguments proves too much and has little attraction. A chilling effect argument may be made in every case alleging retaliation. It cannot be the rule that irreparable injury may be established simply by bringing a retaliation claim and then saying that interim relief is necessary to prevent others from being intimidated from contributing to the plaintiff's case or from filing their own claims. Here, Janey-Burrell did not offer one whit of evidence as to any chilling effect nor did she argue the point in her motions for preliminary injunction or for stay pending appeal.[4] Rather, the chilling effect issue was first raised sua sponte by the second district court judge in issuing the stay pending appeal. Plaintiff is basically arguing for a per se rule that a conclusory assertion made by the plaintiff for the first time in appellate briefs is sufficient to establish a chilling effect and to obtain injunctive relief. We reject that notion and the notion that plaintiff need adduce no evidence on this point.
 
 
 23
 This is not to say that a retaliation claim may never give rise to a showing of irreparable injury, but only that it is a highly fact specific inquiry. See Holt v. Continental Group, Inc., 708 F.2d 87, 90-91 (2d Cir.1983) (allegations of chilling effect subject to Sampson standards in cases involving the federal government); EEOC v. Anchor Hocking Corp., 666 F.2d 1037, 1043-44 (6th Cir.1981) (examining allegations of chilling effect in light of facts); Bonds v. Heyman, 950 F.Supp. 1202, 1215 n. 13 (D.D.C.1997) (explaining Holt as requiring that chilling effect in cases involving the federal government must be "likely" and, in combination with other circumstances, "extraordinary").[5] In any event, the chilling effect argument made by Janey-Burrell goes primarily to the effect on third parties, not to plaintiff's own injury. In this case, that argument as to the effect on third parties must be viewed in the context that the federal government will be deeply affected by judicial interference with its efforts to streamline its operations, particularly where the streamlining is in response to pressure from voters to do so. There are no facts here to support anything other than a hypothetical chilling effect, and that is plainly inadequate. Considering the arguments before Judge Saris, we can say with great confidence that she did not abuse her discretion in refusing to grant interim equitable relief.
 
 
 24
 As to the effect of a transfer on Janey-Burrell's ability to work with counsel, every case involving a transfer to another location involves this effect. There is no irreparable injury on this factor alone; many litigants have counsel in other locations and the Federal Rules of Civil Procedure were designed to permit discovery throughout the land. More importantly, it is Janey-Burrell's choice to accept the transfer or stay in Boston. If Janey-Burrell chooses not to accept the transfer, she will be located in Boston with her counsel.
 
 C. Probability of Success
 
 25
 Janey-Burrell has three claims under the ADEA: the transfers would effect an impermissible discriminatory impact; she suffered disparate treatment; and the decision to transfer her was motivated by retaliation. Only the third theory warrants much discussion. As to the first two theories, Judge Saris has appropriately noted:
 
 
 26
 [T]he evidence demonstrates that two employees over sixty were reassigned while two over sixty were retained as group leaders. The Deputy Regional Administrator is a sixty-four year old. One forty-something year old was reassigned, while another was retained. A fifty-eight year old was reassigned while a fifty-two year old was retained. These statistics are not adequate to support an inference that the reassignment decision was based on discriminatory age-based criterion.
 
 
 27
 DeNovellis v. Shalala, No. 96-11655-PBS at 8-9 (D.Mass. Sept. 30, 1996) (order denying preliminary injunction). Other than the statistics, there is little evidence, direct or indirect, of discriminatory intent.[6]
 
 
 28
 As to the retaliation claims, in order to show probability of success, Janey-Burrell must establish the existence of a causal connection between her filing the two EEO complaints and the subsequent choice she is forced to make between transfer or demotion.[7] See Randlett v. Shalala, 118 F.3d 857, 862-63 (1st Cir.1997); Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir.1996). Janey-Burrell offers little evidence of such a causal relationship. Mere conjecture and unsupported allegations will not suffice. Rather, she must demonstrate the existence of specific facts that would enable a finding that explanatory reasons offered by the government for her proposed transfer were mere pretext for its true motive of retaliation against her. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508-12, 113 S.Ct. 2742, 2747-50, 125 L.Ed.2d 407 (1993); Mesnick v. General Elec. Co., 950 F.2d 816, 822-29 (1st Cir.1991). She falls short of showing probability of success on the present record.[8]
 
 
 29
 On the same date that Janey-Burrell was reassigned to San Francisco, the four other middle managers on temporary assignment were also reassigned to other cities. Each was given the same choice of accepting reassignment or of accepting a downgrade. Three of the five had not previously filed any discrimination complaint.[9] Even if the evidence is read to suggest a degree of personal animosity between Janey-Burrell and Galligan, that animus did not cause her to be treated any differently than her similarly situated co-workers. Further, personal animosity may have many origins other than a desire to retaliate. The decision made was categorical, not individual.[10] All five GS-14 managers not selected to be a goal leader had been placed on temporary assignment in October 1994. All five were given the choice of being reassigned to an equal position in another city or a demotion while staying in Boston in June 1996. All were given the opportunity to respond to the proposed reassignment as well. Those responses were reviewed by the Regional Director, not Galligan, and she, not Galligan, made the final decision to reassign (even assuming Galligan had some influence). The Regional Director was also uninvolved in the prior claims of discrimination. Under these circumstances, proof of causation is insufficient to show probability of success, as is required for preliminary injunctive relief.
 
 III
 
 30
 After losing their motions for preliminary injunction, DeNovellis and Kelley chose to retire. Their claims for preliminary injunctive relief are moot. See New Hampshire Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 17-18 (1st Cir.1996).
 
 IV
 
 31
 The orders of the district court denying preliminary injunctive relief are affirmed; the "stay" as to Janey-Burrell is ended. Costs to appellees.
 
 
 32
 BOWNES, Senior Circuit Judge (dissenting).
 
 
 33
 The majority concludes that plaintiff Janey-Burrell has failed to demonstrate irreparable injury and probability of success on the merits, both of which are, of course, necessary for a preliminary injunction. I disagree with the majority on both issues and therefore respectfully dissent.
 
 
 34
 * Before discussing the application of the irreparable injury requirement to Janey-Burrell, I must first note my disagreement with the standard the majority applies in assessing whether a preliminary injunction should be granted in a case asserting discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e, and under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-34.
 
 
 35
 I believe a government employee in such cases should be held to the same standard as a private sector employee under like circumstances. The standard that should be applied to all employees--whether they work for the government or for the private sector--is the "familiar [four-factor] standard for issuance of preliminary injunctive relief": irreparable injury, likelihood of success on the merits, balancing the equities, and the public interest. See ante at 62.
 
 
 36
 There is no reason to treat the government as employer any differently than a private employer when it comes to discrimination under Title VII or the ADEA. Discrimination by governmental employers is at least as serious as discrimination by non-governmental employers. See Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) ("In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example.... If the government becomes a lawbreaker, it breeds contempt for law.") (Brandeis, J., dissenting).
 
 
 37
 * The majority envisions three separate tests for the issuance of a preliminary injunction, depending on the circumstances. The "familiar [four-factor] standard," ante at 62, without any additional hurdle, would apply to the ordinary case, presumably including a discrimination case against a private sector employer.
 
 
 38
 The majority would apply a second standard in cases involving government employees asserting only "civil service" claims under the Civil Service Reform Act of 1978, Pub.L. No. 95-454, 92 Stat. 1111 (codified as amended in various sections of 5 U.S.C.) (CSRA). Such employees would be required to make a "genuinely extraordinary" showing of irreparable injury, as set forth in Sampson v. Murray, 415 U.S. 61, 92 n. 68, 94 S.Ct. 937, 953-54 n. 68, 39 L.Ed.2d 166 (1974). See ante at 62-63. I agree with the majority's analysis to this point.[1]
 
 
 39
 In between the foregoing two standards, the majority would apply a third, intermediate standard in the case of "discrimination claims brought by government employees where no civil service claim is involved."[2] Ante at 62-63. Such employees must meet a higher standard than they would if the discriminating employer had been a nongovernmental entity: the government employee must "demonstrat[e] sufficient irreparable harm, taking into consideration 'the wide latitude traditionally granted the government in dispatching its own internal affairs.' " Ante at 63 (quoting Gately, 2 F.3d at 1234).[3] Thus, according to the majority, if the plaintiff happens to be a government employee rather than a private sector employee, a fifth factor gets added to the "familiar" four-factor test for preliminary injunctions.
 
 
 40
 I recognize that, in a case involving government employees alleging discrimination, Gately did apply the "wide latitude" language quoted by the majority.[4] I also recognize that, in the absence of an en banc panel, we are bound by a prior precedent. Nevertheless, Gately took that language from Sampson, a case which involved only a CSRA claim (and only a probationary employee). Neither the Supreme Court in Sampson nor this court in Gately discussed any rationale for applying such language in the context of a pure discrimination case, especially when Title VII contains no indication that government employers should be afforded any special "latitude" when it comes to enforcement of the Act. See Douglas v. Hampton, 512 F.2d 976, 981 (D.C.Cir.1975) ("Congress clearly intended to give public employees the same substantive rights and remedies that had previously been provided for employees in the private sector."); Martinez v. Orr, 738 F.2d 1107, 1110 (10th Cir.1984) (same); Porter v. Adams, 639 F.2d 273, 278 (5th Cir.1981) (same; also holding that exhaustion of administrative remedies not required by federal employee before bringing suit for preliminary injunction).
 
 
 41
 I think it fundamentally unfair that a person who is discriminated against by her or his employer should face a higher hurdle when seeking to maintain the status quo pending trial because of the mere fortuity that the discriminating employer happens to be the government. To put it another way, I do not believe the government as employer should be given more favorable treatment when it comes to discrimination claims than a private sector employer. I emphasize that Title VII and the ADEA vindicate more important governmental policy interests than mere CSRA " 'procedural safeguards in effectuating the discharge.' " Gately, 2 F.3d at 1234 (quoting Sampson, 415 U.S. at 91, 94 S.Ct. at 953). In the words of the Supreme Court, "[t]he prohibitions contained in the Civil Rights Act of 1964 reflect an important national policy." United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); see General Tel. Co. v. EEOC, 446 U.S. 318, 326, 100 S.Ct. 1698, 1704, 64 L.Ed.2d 319 (1980). The majority seems to agree: the reason offered by the majority to explain why its intermediate Gately standard for government discrimination claims "does not require as high a showing of irreparable harm as Sampson " requires for CSRA cases, is "because of the different policies and circumstances that attend discrimination cases." Ante at 62-63 (citing Gately, 2 F.3d at 1233-34).
 
 
 42
 In my view, rooting out discrimination based on race, gender, or age far outweighs any need to "protect[ ] the processes of the civil service system."[5] See ante at 63. And such discrimination by governmental employers is at least as serious as discrimination by non-governmental employers. See Olmstead, 277 U.S. at 485, 48 S.Ct. at 575 (Brandeis, J., dissenting).
 
 
 43
 There is simply no principled reason why Janey-Burrell, a non-probationary government employee with twenty-five years of service, raising discrimination claims as well as CSRA claims, should be required to show a higher level of irreparable injury than the ordinary, "familiar standard" for employees who charge their non-governmental employers with discrimination. I would not treat the governmental employer any more leniently than the non-governmental, as the majority does, by applying a stricter standard to government employees than to non-governmental employees when they seek a preliminary injunction based on alleged discrimination. I would apply one single "traditional test" to all Title VII or ADEA plaintiffs, regardless of who their employer is.
 
 B
 
 44
 I also disagree with the majority's distinction between how it treats "discrimination claims brought by government employees where no civil service claim is involved," ante at 62-63, and those discrimination claims which are joined with a claim under the CSRA.
 
 
 45
 According to the majority, "the question may arise" as to which standard would apply, the stricter Sampson standard or the intermediate Gately test, in a case such as this where a plaintiff has brought both a discrimination claim and a CSRA claim. Ante at 63. The majority concludes that "[w]e need not consider this question until it is squarely before us." Id. To me, there is no legitimate question here: even though the CSRA claim would be subject to Sampson 's requirement of a "genuinely extraordinary" showing of irreparable injury, the Title VII claim should not be; the highest hurdle to which those claims should be subjected is Gately 's intermediate test. I cannot imagine why the majority leaves open the possibility that the "extraordinary" Sampson standard would ever be applied to a discrimination claim, regardless of whether it was joined to an additional CSRA claim.
 
 
 46
 The anomalous nature of this possibility becomes apparent when we consider an example. If a plaintiff alleges a single Title VII (or ADEA) claim alone, the majority would apply the intermediate Gately standard of irreparable injury in deciding her motion for a preliminary injunction. The majority would apply this intermediate standard, and not Sampson 's "extraordinary" showing standard, in part because Title VII and the ADEA vindicate more important governmental policy interests, see ante at 63; Aikens, 460 U.S. at 716, 103 S.Ct. at 1482, than mere CSRA " 'procedural safeguards in effectuating the discharge,' " Gately, 2 F.3d at 1234 (quoting Sampson, 415 U.S. at 91, 94 S.Ct. at 953).
 
 
 47
 Assume now that the same plaintiff adds a second cause of action stating, in addition to race discrimination, that the government also violated her civil service procedural rights. Should the government--by allegedly violating an additional law--get the benefit of a more advantageous (to it) standard (Sampson 's "genuinely extraordinary" showing of irreparable injury instead of the intermediate Gately standard) when a court evaluates whether to maintain the status quo pending trial? The majority leaves this question open, ante at 63, implying that this court might, in some future case, answer the question in the affirmative.
 
 
 48
 But such an answer would totally ignore the strong national policy that employers not discriminate against their employees based on race, gender, or age. See Aikens, 460 U.S. at 716, 103 S.Ct. at 1482; General Tel. Co., 446 U.S. at 326, 100 S.Ct. at 1704. Under the majority's test, the Gately "wide latitude" test should be applied, rather than the traditional four-factor test that is applied to private sector employees. Ante at 63. That latitude should not carry any extra weight--should not be permitted to ratchet up the standard to the "extraordinary" Sampson test--merely because an additional violation (of the CSRA) is added to the employee's complaint.
 
 
 49
 In short, the analysis should not change depending on whether a discrimination claim stands alone or is joined to an additional (CSRA) claim. I would not reward the government for violating a second federal law (the CSRA) in addition to violating Title VII or the ADEA.
 
 II
 
 50
 The majority concludes that Janey-Burrell failed to demonstrate irreparable injury, whether Sampson 's heightened standard or the intermediate Gately standard is applied. I disagree with this conclusion as well. In particular, I believe that Janey-Burrell has demonstrated irreparable injury through her allegation that the Secretary's alleged retaliation against her could well intimidate potential witnesses to her underlying discrimination claims. If potential witnesses fear that they too will be retaliated against if they testify to the alleged discrimination against Janey-Burrell, then those witnesses may be "chilled" in their willingness to testify candidly in relation to her claims. This chilling effect could leave Janey-Burrell unable to prove her case either at the administrative level or in district court. Even if her discrimination claims have merit, she could well be unable to win any remedy for it.
 
 
 51
 The majority concludes that Judge Saris did not abuse her discretion in finding no irreparable injury. In limiting its analysis to Judge Saris's ruling, the majority ignores the fact that, upon reconsideration, the district court (Gertner, J.) considered both irreparable injury and likelihood of success on the merits of the relevant retaliation claim, and determined that Janey-Burrell was entitled to a stay pending appeal. It can be cogently argued that Judge Gertner's decision, not Judge Saris's, constituted the district court's final word on Janey-Burrell's motion for a preliminary injunction. Although Judge Gertner's memorandum opinion addresses the plaintiffs' motions for a stay pending appeal, it recognized that, "[i]n effect, ... this court is being asked to reconsider Judge Saris' thoughtful analysis."
 
 
 52
 The district court has "plenary authority" to reconsider its own rulings if it believes it has erred, and to grant a motion it had previously denied. El Fenix de Puerto Rico v. The M/Y JOHANNY, 36 F.3d 136, 140 n. 2 (1st Cir.1994); cf. National Metal Finishing Co. v. Barclaysamerican/Commercial, Inc., 899 F.2d 119, 123 (1st Cir.1990) (Even after entry of judgment, the purpose of Rule 52(b) is to allow reconsideration in order to "correct[ ] ... manifest errors of law or fact."). Once the case had been transferred from Judge Saris to Judge Gertner, the latter constituted the district court for the purposes of this case. Santiago v. Group Brasil, Inc., 830 F.2d 413, 415 n. 2 (1st Cir.1987) (Second judge to whom case had been reassigned stood in shoes of first judge, and "was free to entertain motions to reconsider previous rulings to the same extent as [first judge] would have been."); see Flibotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 25 (1st Cir.1997) (same).
 
 
 53
 Undertaking that reconsideration, Judge Gertner explicitly considered the merits of the relevant retaliation claim and the chilling effect it would have; she determined that Janey-Burrell was likely to succeed on the merits and that she would suffer irreparable injury without a restrainer; she made findings regarding the other two prongs of the preliminary injunction test; and she granted Janey-Burrell a stay pending appeal.
 
 
 54
 I do not believe we can hold that Judge Gertner abused her discretion in making these findings and granting the stay, which she realized in effect constituted a reconsideration of Judge Saris's decision denying a preliminary injunction as to Janey-Burrell. Even if Judge Gertner's reconsideration were given no effect, I would hold, for the reasons set forth in the remainder of this opinion, that Judge Saris abused her discretion in denying Janey-Burrell's motion for a preliminary injunction.[6]
 
 
 55
 I recognize that abuse of discretion is a deferential standard, but that does not mean that an appellate court will abdicate its responsibility to review the ruling of the nisi prius court. See Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir.1988); Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 815 (4th Cir.1992) (Appellate review of grant or denial of temporary injunction should not be a "mere rubber-stamp[ ]."); cf. Gasperini v. Center for Humanities, Inc., 518 U.S. 415, ----, 116 S.Ct. 2211, 2223, 135 L.Ed.2d 659 (1996) (reaffirming authority of appellate courts to review for abuse of discretion a district court's denial of motion to set aside jury verdict as excessive). Indeed, "[p]erhaps the most important area where parroting the discretion phrase is likely to lead to wrong decisions is the review of the grant or denial of preliminary injunctions." Direx, 952 F.2d at 814 (quoting Henry J. Friendly, Indiscretion About Discretion, 31 Emory L.J. 747, 773 (1982)). Discretion must be exercised "in a manner to subserve and not to impede or defeat the ends of substantial justice." Sturman v. Socha, 191 Conn. 1, 463 A.2d 527, 531 (1983) (internal quotation marks omitted); see Allegro v. Afton Village Corp., 9 N.J. 156, 87 A.2d 430, 432 (1952) (In exercising its discretion, a court should not lose sight of its "paramount objective" of rendering justice.); cf. Gasperini, 518 U.S. at ----, 116 S.Ct. at 2223 (Appellate review is "a control necessary and proper to the fair administration of justice.").
 
 
 56
 Application of an improper legal standard is " 'never within the district court's discretion.' " Camel Hair & Cashmere Inst. of America, Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 13 (1st Cir.1986) (quoting Bellotti, 641 F.2d at 1009). Likewise, "misapplication of the law to particular facts is an abuse of discretion." Camel Hair, 799 F.2d at 13. For example, we will reverse a decision for abuse of discretion if the court below ignored "a material factor deserving significant weight," relied upon an improper factor, or, though assessing all appropriate and no inappropriate factors, made "a serious mistake in weighing these factors." Procter & Gamble, 864 F.2d at 929. I believe the district court (Saris, J.) abused its discretion in finding no irreparable injury here.
 
 
 57
 I agree with the majority and the district court that, standing alone, the loss of pay and prestige entailed when one loses a management job fails to meet the irreparable harm standard; such harms--including the temporary reversion to a GS-13 grade in order to remain in Boston pendente lite--can be compensated by money damages if plaintiff prevails at trial.[7] See Sampson, 415 U.S. at 91-92, 94 S.Ct. at 953-54; Gately, 2 F.3d at 1233-34. I believe it was error, however, for the district court to conclude, on this basis, that Janey-Burrell failed to demonstrate irreparable injury. Judge Saris ignored "a material factor deserving significant weight" (which Judge Gertner correctly found applicable), namely the chilling effect of retaliatory actions; as a result, Judge Saris erred in weighing the relevant factors. See Procter & Gamble, 864 F.2d at 929.
 
 
 58
 It is well established that, "[i]f the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel. Thus, a cognizable threat of such harm can support a restraining order." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir.1996) (emphasis added) (citations omitted); cf. Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689-90, 49 L.Ed.2d 547 (1976) (Deprivation of a constitutional right, "for even minimal periods of time, unquestionably constitutes irreparable injury.").
 
 
 59
 In this case, Janey-Burrell would suffer irreparable harm sufficient to sustain an injunction, whether the ordinary or the heightened standard applies: she would be damaged in her ability to pursue her EEO complaint--and the integrity of the complaint process would be concomitantly damaged--if apparent retaliation were permitted to go unchecked. Other courts have held that "a Title VII suit involving alleged retaliation presents a situation calling for increased sensitivity on the part of a court." Marxe v. Jackson, 833 F.2d 1121, 1125-26 (3d Cir.1987). Adverse employment actions "can cause potential witnesses to infer that their employer has retaliated and thereby discourage their cooperation with aggrieved plaintiffs." Marxe, 833 F.2d at 1126; cf. EEOC v. Astra USA, Inc., 94 F.3d 738, 744 (1st Cir.1996) ("To fulfill the core purposes of the statutory scheme, 'it is crucial that the [Equal Employment Opportunity] Commission's ability to investigate charges of systemic discrimination not be impaired.' ") (quoting EEOC v. Shell Oil Co., 466 U.S. 54, 69, 104 S.Ct. 1621, 1631, 80 L.Ed.2d 41 (1984)). Similarly, where a plaintiff alleges retaliation for filing an EEO complaint, failure to preserve the status quo can have a "deleterious effect on the exercise of these rights by others," and can chill the legitimate oppositional activities of others similarly situated. Garcia v. Lawn, 805 F.2d 1400, 1405 (9th Cir.1986). We must not forget that the enforcement of antidiscrimination laws serves not only the interests of the private parties but also "vindicate[s] the public interest in preventing employment discrimination." General Tel. Co. v. EEOC, 446 U.S. at 326, 100 S.Ct. at 1704; Astra, 94 F.3d at 745 (public policy "clearly favors the free flow of information between victims of [sexual] harassment and [the EEOC,] the agency entrusted with righting the wrongs inflicted upon them").
 
 As the Second Circuit observed:
 
 60
 A retaliatory discharge carries with it the distinct risk that other employees may be deterred from protecting their rights under the Act or from providing testimony for the plaintiff in her effort to protect her own rights. These risks may be found to constitute irreparable injury.
 
 
 61
 Holt v. Continental Group, Inc., 708 F.2d 87, 91 (2d Cir.1983) (emphasis added).
 
 
 62
 I agree with our sister circuits on this point, and would hold that, in appropriate circumstances, the potential chilling effect of retaliation on the ability of employees to protect their rights under the antidiscrimination laws may be found to constitute sufficient irreparable injury to warrant a preliminary injunction, even under the heightened standard of Sampson v. Murray. The majority opinion alludes to these decisions, but does not make it clear whether and under what circumstances it believes such a chilling effect may be sufficient to satisfy the irreparable injury requirement for a preliminary injunction in circumstances such as these.
 
 
 63
 In minimizing Janey-Burrell's chilling effect argument, the majority notes that "Congress has chosen the route of awarding attorneys fees to successful plaintiffs to dispel disincentives to the bringing of meritorious suits." Ante at 65 n. 7. But attorneys fees only dispel disincentives based on the high cost of litigation; attorneys fees do nothing to dispel the disincentive of an employer's retaliatory vendetta which can intimidate potential witnesses and thereby prevent a plaintiff from adequately prosecuting even a meritorious claim.
 
 
 64
 In this case, Janey-Burrell has articulated a sufficient expectation that she will suffer the same type of irreparable harm described by the Second Circuit in Holt: the deterrence of other employees from testifying on behalf of Janey-Burrell (or from protecting their own rights). Janey-Burrell's transfer across the continent "can cause potential witnesses to infer that their employer has retaliated and thereby discourage their cooperation with [the] aggrieved plaintiff[ ]" for fear of suffering a similarly adverse fate. Marxe, 833 F.2d at 1126. This potential for intimidation will be reduced to some degree, "if potential witnesses observe that the courts afford prompt relief from retaliatory action." Id.
 
 
 65
 The majority notes that Janey-Burrell could choose not to be transferred, simply by accepting a demotion in grade and status in Boston.[8] Ante at 63-64. It is true that the monetary aspect of such a demotion can be remedied after trial if Janey-Burrell prevails. But the chilling effect of the demotion on witnesses cannot be remedied so easily. The chilling effect on witnesses is not dependent on whether the retaliation comes in the form of an involuntary transfer to San Francisco or a demotion to a GS-13-grade non-supervisory job in Boston. Indeed, many potential witnesses and complainants might be deterred more by the threat that their speaking out could result in their demotion in pay and status than by the threat of a transfer to a distant city. If Janey-Burrell loses her underlying case because no witnesses are willing to come forward and testify, then she will never be remedied for her monetary losses arising from the allegedly retaliatory demotion.
 
 
 66
 I share the majority's concern that not every plaintiff who alleges retaliation by her employer should be able to obtain a preliminary injunction merely by asserting that witnesses might conceivably be "intimidated from contributing to the plaintiff's case" out of fear of retaliation.[9] See ante at 64. On the other hand, we should be at least as vigilant against the risk that a plaintiff whose claim has merit will nevertheless be unable to prove her claim because she cannot meet the majority's standard for demonstrating with specificity that material witnesses who might have otherwise testified to actual discrimination by the employer against the plaintiff are now afraid to testify based on the employer's allegedly retaliatory transfer of the plaintiff to an office 3,000 miles away. I find it highly unlikely that a witness who is intimidated enough to refuse to testify on the underlying discrimination would nevertheless be willing to jeopardize her own career by signing an affidavit attesting that she is reluctant to tell all she knows because of the chilling effect of the employer's retaliation against the initial plaintiff.
 
 
 67
 Wishing to be neither overinclusive nor underinclusive, I would conduct an individualized assessment of all relevant factors. In the circumstances of this case, I would give Janey-Burrell the benefit of the doubt regarding the adequacy of her showing that she would be irreparably injured by the chilling effect of her employer's alleged retaliation. Janey-Burrell is a non-probationary employee with twenty-five years of exemplary service in the Boston office. Shortly after she filed complaints of discrimination, her supervisor personally interjected himself in the implementation of adverse actions against her in a manner that is highly unusual for someone of his rank. See infra at 75. Importantly, the injunction she sought would simply maintain the status quo pendente lite, without causing any serious harm to her employer's overall reorganization or operations. See Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir.1980) (Because the purpose of a preliminary injunction is to preserve the status quo until the rights of the parties can be adjudicated, the courts have distinguished between a motion for preliminary injunctive relief to maintain the status quo and one to provide mandatory relief.). Given these circumstances, I would hold that Janey-Burrell has demonstrated a "cognizable threat" of irreparable harm, Baccarat, Inc., 102 F.3d at 19, and should have been granted a restraining order.
 
 
 68
 This result is not inconsistent with the result in Gately. There, we found such irreparable harm in plaintiffs' allegations that went beyond "temporary loss of pay or reputational injury." 2 F.3d at 1233-34 (citations omitted). We emphasized the fact that the Gately plaintiffs were "arguing that their statutorily-based civil rights [would] be violated," and not merely "claiming that they [were] 'entitled to additional procedural safeguards in effectuating the discharge.' " Gately, 2 F.3d at 1234 (quoting Sampson, 415 U.S. at 91, 94 S.Ct. at 953). In addition to these two "significant respects" in which the Gately facts were distinguishable from Sampson 's facts, we noted that the Gately plaintiffs were not seeking interim injunctive relief pending completion of an administrative appeals process, and that the district court "unquestionably had the authority to issue the requested equitable relief" (citing the judicial relief provisions of the ADEA). Gately, 2 F.3d at 1233-34.
 
 
 69
 Similarly, Janey-Burrell's case involves claims under federal civil rights statutes in addition to her merely procedural claims, and those civil rights statutes grant the court the authority to reinstate illegally discharged employees. Moreover, Janey-Burrell has adequately asserted irreparable harm that goes beyond mere loss of pay or reputational injury, thereby satisfying three of the four Gately distinguishing factors.
 
 
 70
 It is true that Janey-Burrell has not exhausted her administrative remedies and thus has not satisfied one of the Gately factors. Nevertheless, she is distinguishable from Jeanne Murray, the plaintiff in Sampson v. Murray, in another fundamental respect, not listed among the four Gately factors. Ms. Murray was a probationary employee who had worked for the government for a mere four months. She sought an injunction precluding her dismissal from her job during the pendency of the litigation, which could have lasted (and did last) for years. Equitable considerations surely cast her in a different light than Janey-Burrell, who had worked for HHS in Boston for more than twenty-five years before the agency proposed to transfer her across the country.
 
 
 71
 This difference is amplified when we consider the purpose of a preliminary injunction: "to preserve the status quo until the rights of the parties can be fairly and fully investigated and determined." Wetzel, 635 F.2d at 286 (quotation omitted); Omega Importing Corp. v. Petri-Kine Camera Co., 451 F.2d 1190, 1197 (2d Cir.1971) (citing 7 James Wm. Moore, Federal Practice p 65.04 (2d ed.1955)). When Janey-Burrell sought a preliminary injunction precluding her involuntary transfer, she merely sought to preserve the status quo, even though her administrative charge had not yet been resolved. Ms. Murray, in contrast, would have required the Court to strain the meaning of the "status quo" beyond recognition if the Court had permitted her to bootstrap her four-month tenure into several years' court-ordered employment. The irreparable injury to Murray's employer, if the Court had affirmed the restraining order in Sampson, would have outweighed the irreparable injury Murray would suffer if the restrainer were denied. In short, Janey-Burrell is more akin to the Gately plaintiffs, who were entitled to an injunction maintaining the status quo pendente lite, than to the plaintiff in Sampson who was not so entitled.
 
 III
 
 72
 Finally, I disagree with the majority's conclusion that Janey-Burrell failed to demonstrate a likelihood of success on the merits of her retaliation claim. Janey-Burrell filed three EEO complaints, two of which involved claims of retaliation. Her second EEO complaint alleged that, in April 1994, she was assigned to a temporary "detail" in retaliation for her having filed her first complaint of race and gender discrimination. Her third EEO complaint alleged that her involuntary transfer from Boston to San Francisco was in retaliation for her having filed her first two complaints.
 
 
 73
 Although the present motion for preliminary injunction relates to the latter complaint, Judge Saris analyzed Janey-Burrell's likelihood of success on her retaliation claim by considering only the first such claim (the temporary "detail").[10] Judge Saris's entire analysis of the merits of Janey-Burrell's retaliation claims is the following: "Janey-Burrell was detailed to a position of great significance in the community in the office of the former regional director, Philip W. Johnston. Johnston stated in his affidavit that Galligan proposed the detail in response to Johnston's request for someone with Janey-Burrell's significant expertise. That hardly sounds like retaliation."
 
 
 74
 Whether we agree or disagree with the foregoing analysis,[11] it addresses the wrong retaliation claim. Janey-Burrell seeks a preliminary injunction against her 1996 involuntary transfer to San Francisco; she claims that that transfer, after almost twenty-five years of service at HHS in Boston, was retaliatory. The motion presently before the court has nothing to do with the 1994 temporary detail. Judge Saris's opinion erred as a matter of law by failing to analyze the likelihood that Janey-Burrell will succeed on the merits of this last retaliation claim.
 
 
 75
 Applying our precedents to Janey-Burrell's third complaint (her second retaliation claim) leads me to disagree with the majority and to conclude that Janey-Burrell is likely to succeed on the merits. To establish a prima facie case of retaliation, Janey-Burrell had to demonstrate that (1) she engaged in protected conduct; (2) she suffered from an adverse employment decision; and (3) the protected conduct and the adverse action were causally connected. Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir.1996). The ADEA and Title VII of the Civil Rights Act of 1964 analogously protect an individual who has filed an EEO complaint from retaliation therefor. See id. at 535 n. 9. The underlying complaint does not have to be correct or successful. As we noted in the Title VII context, "there is nothing in [the statute's] wording requiring that the charges be valid, nor even an implied requirement that they be reasonable." Wyatt v. City of Boston, 35 F.3d 13, 15 (1st Cir.1994) (citations omitted). "[I]t is 'well settled' that [the retaliation provisions] protect[ ] an employee regardless of the merit of his or her EEOC charge." Id. (quoting Sias v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir.1978)).
 
 
 76
 Janey-Burrell's filing of an EEO claim constituted protected conduct. See 42 U.S.C. § 2000e-3(a) (specifically protecting such conduct); Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir.1988). And both the reassignment to San Francisco and the demotion to a GS-13 were, under the circumstances, undoubtedly adverse employment actions. See Wyatt, 35 F.3d at 15-16 (pointing to "other adverse actions" covered by Title VII "such as demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees") (emphasis added); Dominic v. Consolidated Edison Co. of New York, Inc. 822 F.2d 1249, 1254-55 (2d Cir.1987) (holding an unfavorable transfer to constitute an adverse employment decision); DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997) (noting that taking something of consequence from an employee, including divesting her of significant responsibilities, constitutes an adverse employment action).
 
 
 77
 The majority concludes that Janey-Burrell cannot succeed on the merits because she "offers little evidence" of "a causal connection between her filing the two EEO complaints and the subsequent choice she is forced to make between transfer or demotion." Ante at 65. But in many cases such as this one, the causal connection must be shown through indirect means such as inferences and circumstantial evidence because "[t]here will seldom be eyewitness testimony as to the employer's mental processes." See Aikens, 460 U.S. at 716, 103 S.Ct. at 1482. Such indirect evidence may be sufficient to demonstrate the requisite causal connection. Id.
 
 
 78
 The majority finds Janey-Burrell's proof of causation to be insufficient to show probability of success. I disagree. I find the evidence and inferences here--among other things, facts set forth in Janey-Burrell's affidavit and undisputed by the government--to be sufficiently persuasive. Within five months of her filing her first EEO complaint alleging race- and gender-based discrimination on the part of Hugh Galligan, the Regional Administrator of ACF for Region I, Galligan removed Janey-Burrell from her supervisory position and detailed her to a temporary undefined position. Significantly, on Friday, April 8, 1994, Galligan personally delivered a memorandum to Janey-Burrell, announcing the removal and detail effective the following Monday. Galligan instructed her to move all her belongings by that Monday, April 11. When Monday arrived, Galligan personally appeared at Janey-Burrell's office door with a hand-cart and began to move her belongings. Needless to say, this kind of personal involvement was unusual behavior for an official of Galligan's rank. It reeks of retaliation. See Mesnick v. General Elec. Co., 950 F.2d 816, 828 (1st Cir.1991) (evidence of a supervisor's "vengeful preoccupation" would suggest a retaliatory animus); see also Oliver, 846 F.2d at 110 ("A showing of discharge soon after the employee engages in an activity specifically protected by ... Title VII ... is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation.").
 
 
 79
 Galligan's intense personal interest in Janey-Burrell was highlighted again in June 1996, when he personally delivered to her the letter containing her reassignment to San Francisco. Galligan told her "It's bad news. You're not going to like this."
 
 
 80
 As its legitimate non-discriminatory explanation for its actions, the government asserts that its personnel actions regarding Janey-Burrell were related to a reorganization of its offices, intended to streamline the agency and make it more efficient. The government, of course, is entitled to reorganize its offices, and efficiency is certainly a laudable goal. But the government may not use its reorganization/improved-efficiency rationale as a pretext to mask actual discrimination or retaliation; the mere incantation of the mantra of "efficiency" is not a talisman insulating an employer from liability for invidious discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). As discussed supra, Galligan, who was the object of Janey-Burrell's EEO charges, was a major player in the decision concerning how the department would be reorganized, which jobs were to be eliminated and which were to be retained, and who was to be assigned to which location.[12] And Galligan's personal involvement in the mechanics of Janey-Burrell's physical relocation bespeaks an emotional involvement beyond mere objective efficiency. It is a fair inference, not seriously rebutted by the government, that Galligan's animosity toward Janey-Burrell was causally connected to her having filed EEO charges against him, and that his decisions to reassign and transfer her were retaliatory. See Mesnick, 950 F.2d at 828; Oliver, 846 F.2d at 110. This is especially true in light of the letters in the record from a wide variety of community and governmental leaders attesting to the quality and importance of Janey-Burrell's work in Boston neighborhoods.
 
 
 81
 Moreover, " '[d]epartures from the normal procedural sequence' " are among the factors a court may consider in assessing discriminatory motive. See Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, ----, 117 S.Ct. 1491, 1503, 137 L.Ed.2d 730 (1997) (quoting Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 563-64, 50 L.Ed.2d 450 (1977)). Janey-Burrell argues that the Department refused to follow the CSRA and its own regulations pertaining to RIFs and to her reassignment to a position in a different commuting area. To the extent that her procedural claims prove to be true, such deviations from regular procedure would constitute further circumstantial evidence of discriminatory motivation.
 
 
 82
 To counter this inference, the government notes that there were ten similarly situated managers in the Regional Office, and only five of them were given directed reassignments out of the area; the other five were retained in permanent positions in the Boston Region. Moreover, only two of the five transferees had filed prior EEO complaints. These numbers do nothing to negate the claim of retaliation. The government does not address the more relevant (though still not dispositive) question of whether anyone who had previously filed an EEO complaint ended up with one of the permanent positions. I note, moreover, that the majority states: "[t]he decision made was categorical, not individual. All five GS-14 managers not selected to be a goal leader ... were given the choice of being reassigned to an equal position in another city or a demotion while staying in Boston." Ante at 66 (emphasis added). The majority ignores the critical fact that the Secretary, acting primarily through Galligan, made a conscious choice as to which five employees would retain their rank and location and which five would suffer an adverse action (i.e., a choice between two adverse actions). I think the record contains facts giving rise to a fair inference that retaliation was the reason Janey-Burrell was one of the five selected for a transfer. I would conclude, therefore, that Janey-Burrell has made a sufficient showing of likelihood of success on the merits of her claim of retaliation.
 
 IV
 
 83
 In sum, I believe Janey-Burrell has demonstrated a likelihood of success on the merits of her retaliation claim and irreparable injury as to that claim. As noted, there is a strong "public interest in preventing employment discrimination," General Tel. Co. v. EEOC, 446 U.S. at 326, 100 S.Ct. at 1704, and particularly in assuring the integrity of the enforcement process by nipping any retaliation in the bud, see Lawn, 805 F.2d at 1405; Holt, 708 F.2d at 91. As for balancing the equities, Janey-Burrell, after twenty-five years of exemplary service to the Boston office, simply asks to maintain the status quo pendente lite. See Wetzel, 635 F.2d at 286. She asks this not merely because the proposed transfer would cause her own dislocation, but also because she is the legal guardian for her asthmatic grandson, whose natural mother lives in Boston, and the transfer to San Francisco would create serious obstacles in Janey-Burrell's effort to reunite her grandson with his mother. In contrast, the injury to the government would be minimal if the injunction were granted: HHS would simply be ordered to do what it has the discretion to do and retain Janey-Burrell at her pay and grade in the Boston office until the merits of her claims are determined. Neither the agency nor the government at large would be forced to derail the entire government reorganization/improved-efficiency process in its tracks, a specter that the government disingenuously conjured up in opposing the motion for preliminary injunction. The government's inconvenience can in no way outweigh the potential harm to Janey-Burrell and to the public interest.
 
 
 84
 In evaluating an application for a preliminary injunction, "[t]he heart of the matter is whether 'the harm caused plaintiff without the injunction, in light of the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants.' " United Steelworkers of America v. Textron, Inc., 836 F.2d 6, 7 (1st Cir.1987) (quoting Vargas-Figueroa v. Saldana, 826 F.2d 160, 162 (1st Cir.1987)). Because this balance weighs decidedly in favor of Janey-Burrell, I would hold that the district court abused its discretion in failing to grant Janey-Burrell's motion for a preliminary injunction.
 
 
 85
 The majority opinion makes it extremely difficult for government employees to preserve the status quo pendente lite through a preliminary injunction, more difficult than it would be for their non-governmental counterparts who file discrimination claims joined with CSRA claims. The majority opinion permits the government to reap the benefits of its alleged discrimination for long periods of time, and imposes a very high hurdle before a court can provide an effective remedy to civil servants who, like Janey-Burrell, have devoted decades of service to the government. I respectfully dissent.
 
 
 
 [1]
 The dissent argues that Judge Gertner's ruling was in effect a reconsideration of Judge Saris's denial of the injunction under Fed R. Civ. P. 60(b). But Judge Gertner did not purport to grant relief under Rule 60(b); she explicitly stated that she was granting relief pending the appeal under Rule 62(c). A new district court judge in a case may reconsider a prior denial of a preliminary injunction. If a court wishes to reconsider an earlier ruling under the Rule 60(b) power, however, it should be explicit about it. The new district court judge here explicitly did not reconsider the prior ruling
 
 
 [2]
 We agree that there is a strong legislative policy prohibiting discrimination based on age and other forbidden factors. The prohibiting of retaliation against those who bring discrimination claims, while not primarily vindicating such anti-discrimination policies, is important in effectuating them. See Tanca v. Nordberg, 98 F.3d 680 (1st Cir.1996) (mixed motive provisions of Civil Rights Act of 1991, which apply to discrimination claims, do not apply to retaliation claims). The issue here is not whether these policies are important, they plainly are, but the extent to which they alter the rules as to issuance of preliminary injunctive relief where the full array of remedies to combat age discrimination and retaliation is available after trial on the merits
 In this circuit, the rules governing the issuance of injunctive relief are not altered because the plaintiff makes a discrimination claim. Such plaintiffs must still satisfy the traditional test in order to obtain injunctive relief. See Equal Employment Opportunity Comm'n v. Astra USA, Inc., 94 F.3d 738 (1st Cir.1996). In Astra, the question was whether the EEOC was required to meet the traditional test for injunctive relief or whether it needed only satisfy the criteria established in § 706(f)(2) of Title VII, which authorized the agency to seek injunctive relief in the public interest. We flatly rejected the views of other circuits that the traditional test could be relaxed in that situation, holding that even the EEOC was required to show irreparable harm and the inadequacy of legal remedies in order to obtain a preliminary injunction. See Astra, 94 F.3d at 743; see also Cohen v. Brown University, 991 F.2d 888 (1st Cir.1993) (requiring traditional test to be satisfied in Title IX suit); Castro v. United States, 775 F.2d 399 (1st Cir.1985) (requiring traditional test to be satisfied in ADEA suit). If the EEOC itself is required to meet the traditional test, then Janey-Burrell must be as well.
 
 
 [3]
 Gately squarely holds that Sampson 's heightened standard is not limited to probationary employees, see id. at 1232-33, as the dissent would have
 
 
 [4]
 We do not reach the question of whether Janey-Burrell has waived this argument in light of our disposition
 
 
 [5]
 The dissent cites Marxe v. Jackson, 833 F.2d 1121 (3d Cir.1987) in support the position that the potential chilling effect in this case constitutes irreparable harm. In Marxe, the plaintiff was fired by her employer against whom she had previously filed EEO charges. She subsequently brought suit for retaliatory firing. The district court granted a preliminary injunction and required the employer to reinstate the plaintiff during the litigation in part because of concern about the potential chilling effect that might otherwise occur. See id. at 1124. The Third Circuit reversed. The court said that plaintiff had failed to adduce any evidence that a chilling effect might occur and that consequently there was no irreparable harm. See id. at 1125-26
 
 
 [6]
 We note the civil service process may work to plaintiff's favor in that she may have an administrative remedy. Notably, Judge Saris found Janey-Burrell had a probability of success on her CSRA claim. Even so, in Sampson, the Supreme Court stated that the avoidance of the disruption of the civil service administrative process was a significant factor against issuing injunctive relief in cases involving civil service claims. See Sampson, 415 U.S. at 83-84, 94 S.Ct. at 949-50; see also, Bush v. Lucas, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (assuming violation of First Amendment and declining to create judicial cause of action which would circumvent civil service review); Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (no constitutional right to hearing prior to suspension or discharge from government service even for a non-probationary employee)
 
 
 [7]
 If plaintiff wins on her retaliation claim, she will be compensated and her attorneys will receive reasonable attorney's fees. Congress has chosen the route of awarding attorneys fees to successful plaintiffs to dispel disincentives to the bringing of meritorious suits
 
 
 [8]
 Janey-Burrell claims she was subject to two acts of retaliation, the first coming when Galligan detailed her to a temporary assignment in April 1994, the second coming when she was given the choice between transferring to San Francisco or staying in Boston. Judge Saris focused on the first act of claimed retaliation and appropriately found Janey-Burrell had not shown a probability of success because she was ultimately assigned to a significant position, as Violence Prevention and Community Based Program Coordinator, in the office of former regional director Philip W. Johnston
 
 
 [9]
 DeNovellis filed a claim of discrimination which he has lost on the merits. See DeNovellis v. Shalala, 124 F.3d 298 (1st Cir.1997)
 
 
 [10]
 Galligan made recommendations as to who would be selected to be a goal leader in the reorganized ACF. Galligan's affidavit states that he made the recommendations without regard to age, race, or ethnicity, and without regard to whether any of the candidates had filed EEO claims against him. The record shows that the five selected to be goal leaders are all over forty years of age, include both women and men, and both African-Americans and whites. Janey-Burrell offers no evidence suggesting that Galligan was motivated by discriminatory animus or a desire to retaliate in making these recommendations
 
 
 [1]
 I believe, however, that Sampson 's heightened standard and the policies it relies on are applicable only in the context of probationary government employees. In cases of non-probationary employees, I would apply nothing more than "the familiar [four-factor] standard for issuance of preliminary injunctive relief," ante at 62, the same as we would apply to non-governmental employees. Other courts have held that Sampson 's heightened standard of irreparable injury applies only to the probationary employee "type of case." See Oglala Sioux Tribe v. Andrus, 603 F.2d 707, 712 (8th Cir.1979); Garza v. Texas Educ. Found., 565 F.2d 909, 911 (5th Cir.1978)
 According to the majority, "Gately squarely holds that Sampson 's heightened standard is not limited to probationary employees." Ante at 63 n. 3 (citing Gately, 2 F.3d at 1232-33). Gately 's holding is not so clear as the majority would like it to be. Gately relied heavily on Sampson, 415 U.S. at 83, 91-92, 94 S.Ct. at 949-50, 953-54, and probationary employees constituted the "type of case" to which Sampson applied.
 One need look no further than the same page of the Gately opinion cited by the majority. As we noted in Gately, the Court in Sampson
 repeatedly referred to the fact-bound nature of its holding. For instance, the Court stated that the plaintiff's showing "falls far short of the type of injury which is a necessary predicate to the issuance of a temporary injunction in this type of case. " And, in the footnote immediately following this holding, the Court stated that "[u]se of a court's injunctive power ..., when discharge of probationary employees is an issue, should be reserved for [the genuinely extraordinary] situation."
 Gately, 2 F.3d at 1233 (quoting Sampson, 415 U.S. at 91-92, 94 S.Ct. at 953-54) (emphasis and alterations in Gately ). Thus, the "type of case" to which Sampson 's heightened standard applies is the discharge of a probationary employee who has raised only civil service claims.
 
 
 [2]
 Perhaps some difficulty in this area of the law is caused by the dual meaning of the term "civil service." It is important to distinguish between a government employee raising a civil service claim under the CSRA, as was the case in Sampson v. Murray, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), and a so-called "civil service" employee who raises a discrimination claim against a governmental employer under Title VII or the ADEA, as Janey-Burrell has
 
 
 [3]
 It is worth noting that this "wide latitude" was offered as the rationale for the "genuinely extraordinary" irreparable injury showing that was required in pure CSRA cases. See ante at 62-63. It is anomalous that it reappears as part of the intermediate Gately standard
 
 
 [4]
 In addition, Gately would appear to require government employees attempting to establish irreparable harm also to "point to factors sufficient to overcome 'the traditional unwillingness of courts of equity to enforce contracts for personal services.' " Gately, 2 F.3d at 1234 (quoting Sampson, 415 U.S. at 83, 94 S.Ct. at 949-50). I do not think the quotation should apply in a discrimination case such as Gately was and the present case is
 The quotation as originally stated in Sampson cited Corbin on Contracts as its authority. 415 U.S. at 83, 94 S.Ct. at 949-50. Perhaps the quoted principle would be applicable in the context of a CSRA civil service procedural claim such as the one before the Court in Sampson; the "civil service" claim may be analogous to an action against a private employer in which the employee seeks to enforce the employer's procedural rules. But at least with respect to a Title VII or ADEA cause of action, a plaintiff seeking a preliminary injunction on the basis of alleged discrimination is not seeking "to enforce [a] contract for personal services." She is seeking to enforce her rights under Title VII or the ADEA not to be discriminated against based on invidious stereotyping. Such rights were created by federal statutes, which supersede any contracts for personal services. Because Janey-Burrell is seeking to vindicate her federal statutory rights--not to enforce her employment contract--I do not believe Gately 's "contract for personal services" gloss applies in a discrimination case such as the present one.
 
 
 [5]
 The majority cites EEOC v. Astra USA, Inc., 94 F.3d 738 (1st Cir.1996), for the proposition that "the rules governing the issuance of injunctive relief are not altered because the plaintiff makes a discrimination claim. Such plaintiffs must still satisfy the traditional test in order to obtain injunctive relief." See ante at 63 n. 2. Astra is inapposite here. I fully agree that a Title VII or ADEA plaintiff "must still satisfy the traditional test," but the question is, what is the "traditional test"? The majority would apply a different "traditional test" to injunctions sought by government employees than it would apply to injunctions sought by non-governmental employees: if a government employee claims discrimination, the majority would subject her injunction motion to Gately 's additional hurdle of overcoming the "wide latitude traditionally granted the government in dispatching its own internal affairs." Ante at 63. Surely the majority cannot rely on Astra to support its special standard for government employees. Astra involved private employees, and simply applied the ordinary four-factor preliminary injunction standard to the EEOC, not a special, heightened standard. See Astra, 94 F.3d at 742
 
 
 [6]
 The same reasoning would apply a fortiori if we were to analyze Judge Gertner's grant of a restraining order under the abuse of discretion standard
 
 
 [7]
 But see Squires v. Bonser, 54 F.3d 168, 173 (3d Cir.1995) (" 'When a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole. The psychological benefits of work are intangible.' ") (quoting Allen v. Autauga County Bd. of Educ., 685 F.2d 1302, 1306 (11th Cir.1982)). A person also gains valuable experience from working, including staying current with issues related to her job. See DeLaughter v. United States Postal Service, 3 F.3d 1522, 1524 (Fed.Cir.1993); Gately, 2 F.3d at 1234
 
 
 [8]
 It should be noted that HHS offered Janey-Burrell this Boston option only on the eve of the hearing on plaintiffs' motion for a temporary restraining order. The Boston option was not offered at the same time (June 11) that HHS ordered Janey-Burrell's transfer to California, but on August 13, more than two months later. This was six days before the effective date of her transfer (two days before DeNovellis's) and more than three weeks after DeNovellis filed a Formal (Stage 2) Grievance protesting his transfer out of state
 
 
 [9]
 The majority asserts that Janey-Burrell "is basically arguing for a per se rule that a conclusory assertion made by the plaintiff for the first time in appellate briefs is sufficient to establish a chilling effect and to obtain injunctive relief." Ante at 64. The fact is, however, Judge Gertner, who was sitting as the district court in this case at the time, expressly found such a chilling effect. As I note below, I would affirm this finding based on an individualized assessment of the facts before the district court, not based on a per se rule
 
 
 [10]
 Judge Saris did find that Janey-Burrell was likely to succeed on the merits of her CSRA claim. The court held, however, that, because the CSRA cause of action asserted merely procedural flaws in the process by which her involuntary transfer came about, Janey-Burrell had failed to satisfy the heightened showing required to meet the irreparable injury requirement to justify a preliminary injunction in that type of case. See Sampson v. Murray, 415 U.S. 61, 91, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974)
 
 
 [11]
 It was not until three months after Janey-Burrell had filed her second EEO complaint--alleging that the removal and temporary detail to an unclassified position with undefined duties were retaliatory--that former Regional Director Johnston requested that Galligan assign someone like her to his special project, and Janey-Burrell was so detailed
 
 
 [12]
 The majority emphasizes the fact that Galligan was not the final decision-maker, that ACF Director of Regional Operations Diann Dawson could have overridden his selections and Ms. Dawson had no retaliatory animus. Ante at 65-66. This argument is not persuasive. The government does not seriously dispute that Galligan's recommendations to Ms. Dawson carried great weight in determining which employees should be retained in supervisory positions in Boston and which five should be transferred to other regions. Ms. Dawson had only been in her position for approximately one month and was located in Washington, D.C. She had little reason to quarrel with Galligan's decisions, as might have been the case if she in fact knew that Galligan's decision to put Janey-Burrell on the transfer list rather than the retention list might have been motivated by retaliation